Diana Campbell CONNOLLY, Plaintiff,

v.

BIDERMANN INDUSTRIES U.S.A., INC., Bidermann Industries Corporation, Great American Knitting Mills, Harold Ray Russell, and James A. Williams, Defendants.

No. 95 Civ. 1791(RPP).

United States District Court,
S.D. New York.

July 15, 1999.

362

Camhy Karlinsky & Stein LLP, Martin E. Karlinsky, New York City, for Plaintiff.

Roberts & Finger, LLP, Joel L. Finger, Jean L. Schmidt, New York City, for Defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Now pending before the Court is the motion of defendants Bidermann Industries U.S.A., Inc., Bidermann Industries Corporation, Great American Knitting Mills ("Great American"), Harold Ray Russell, and James A. Williams ("defendants") for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, in the alternative, for an amendment to the judgment reducing the back pay award and setting aside the punitive damage award against Great American, pursuant to Rule 59. For the reasons that follow, the motion is denied and the jury verdict will be left undisturbed.

### Background

Plaintiff Diana Campbell Connolly ("Connolly") brought this lawsuit against the defendants, alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Connolly worked for Great American from October 1982 to her termination in January 1995, at which time she held the position of Vice President of Sales for Chain Stores and handled the Sears and K–Mart accounts. That position required her to fly from New York to Chicago, Detroit, and North Carolina on a frequent basis. In the fall of 1994, as a result of flying while she had a cold, Connolly lost the hearing in one ear and suffered from a condition known as tinnitus, a ringing in the ear. Connolly was advised by her physician that she could lose the hearing in her other ear if she continued to engage in flying. One of

the defendants' positions was that plaintiff was not qualified for her position because the ability to fly was an essential function of Connolly's job. (Tr. at 61.) Connolly produced evidence that she notified the company that she would come back to work on January 16, 1995, but could not fly (Pl.Ex. 9); that she was terminated on January 13, 1995, without prior notice, by Executive Vice President of Operations Ray Russell and Vice President for Human Resources Charles Ferguson; that she asked if any other position was available and was told no (Tr. at 538–39); and that Russell in fact knew that the position of Regional Sales Manager for the New York Region was vacant. That position would not have required Connolly to fly.

A jury trial commenced March 1, 1999 and concluded with a verdict for Connolly on March 11, 1999. That verdict was reached with the aid of a number of Court-drafted special interrogatories. The questions, and the respective answers, were as follows:

1. With respect to plaintiff's claim that defendants intentionally terminated her because she had a disability, do you find plaintiff has shown be a preponderance of the evidence that at the time of her termination

(a) plaintiff was a person with a disability?   YES

(b) plaintiff was a qualified person who, with reasonable accommodation, was able to perform the essential functions of her job?   NO

(c) plaintiff was a qualified person who was able to perform the essential functions of a similar vacant position for which she was qualified?YES

(d) defendants did not make reasonable accommodation so as to enable her to perform the essential functions of her position or to assign her to a similar vacant position for which she was qualified?   YES

2. Have defendants shown by a preponderance of the evidence that

plaintiff's reasonable accommodation would be an undue hardship? NO

3. Have defendants presented evidence that plaintiff was terminated for non-discriminatory legitimate business reasons?   YES

4. Has plaintiff shown by a preponderance of the evidence

(a) that defendants' evidence of non-discriminatory reasons for her termination was a mere pretext?   YES

(b) that the more likely motivation for her termination was her disability? YES

(Court Ex. 3.) The jury found that Connolly suffered damages as a direct result of intentional disability discrimination by James A. Williams, Harold Ray Russell, Great American, Bidermann Industries U.S.A., Inc., and Bidermann Industries Corp. and found that she suffered $50,000 in damages for past pain and suffering and loss of enjoyment of life's pleasures, and $475,000 for past lost wages and benefits. It awarded her zero damages for future pain and suffering and for future lost wages and benefits. The jury also awarded her $350,000 in punitive damages as against Great American only. (*Id.*)

On March 10, 1999, at the close of evidence and prior to summations, counsel for the defendants moved pursuant to Rule 50(a)(2) for judgment as a matter of law; that motion was denied. (Tr. at 1478–82.) In their post-trial renewal of that motion, defendants raise three arguments. First, they contend that judgment must be entered in their favor as a matter of law because the jury found that plaintiff was not "a qualified person who, with reasonable accommodation, was able to perform the essential functions of her job" (Court Ex. 3, question 1(c)) and because they were under no legal obligation to offer plaintiff a vacant position. Additionally, they argue that if the Court does not enter judgment in their favor as a matter of law, the jury's back pay damages award should

be reduced from \$475,000 to \$190,000, and the jury's punitive damages award should be set aside, pursuant to Rule 59.

**Discussion**

I. *Rule 50(b)*

■ The defendants argue that under Second Circuit case law, an employer is not obliged to reassign an employee to another vacant position if the employee is not able to perform the essential functions of her job with a reasonable accommodation. (Def. Mem. at 3.) The definition section of the ADA provides in pertinent part:

(8) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. §§ 12111(8)-(9). The general rule of the ADA is that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Among other things, "discrimination" means "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12115(5)(A).

The EEOC has issued interpretive guidelines with respect to the issue of reassigning disabled employees to vacant positions. Those guidelines, which are entitled to "great deference," *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997), provide in pertinent part:

Reassignment to a vacant position is also listed as a potential reasonable accommodation. In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship. Reassignment is not available to applicants. An applicant for a position must be qualified for, and be able to perform the essential functions of, the position sought with or without reasonable accommodation.

Reassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities. Employers should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time. A "reasonable amount of time" should be determined in light

of the totality of the circumstances. As an example, suppose there is no vacant position available at the time that an individual with a disability requests reassignment as a reasonable accommodation. The employer, however, knows that an equivalent position for which the individual is qualified, will become vacant next week. Under these circumstances, the employer should reassign the individual to the position when it becomes available.

An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation. An employer, however, is not required to maintain the reassigned individual with a disability at the salary of the higher graded position if it does not so maintain reassigned employees who are not disabled. It should also be noted that an employer is not required to promote an individual with a disability as an accommodation.

29 C.F.R. Pt. 1630 App. § 1630.2(o) (citations omitted).

The defendants argue that the "transfer or reassignment of an employee who, like Plaintiff, cannot perform the essential functions of her current position is not a reasonable accommodation. Otherwise, the ADA would be an affirmative action statute" forcing employers to favor disabled current employees over other applicants for vacant positions. (Def. Mem. at 6; Repl. Mem. at 3.) However, the language of the statute suggests otherwise. A person is a "qualified individual with a disability" if she can perform the essential

functions of the job position she "holds *or desires*," with or without reasonable accommodation. 42 U.S.C. § 12111(8) (emphasis added).[1] The ADA specifically states that the term "reasonable accommodation" includes "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Far from mandating affirmative action in favor of the disabled, the ADA merely says that not making reasonable accommodations is a form of discrimination. 42 U.S.C. § 12115(5)(A).[2] Moreover, the EEOC interpretive guidelines state that "[e]mployers should reassign the individual to an equivalent position in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time." 29 C.F.R. Pt. 1630 App. § 1630.2(o).

■ Where the meaning of a statute's language is plain, a court need look no further in its analysis, *Sutton v. United Air Lines, Inc.,* —— U.S. ——, 119 S.Ct. 2139, 2146, —— L.Ed.2d —— (1999), but in this case the legislative history also supports plaintiff's position. The House Education and Labor Committee's report on the bill that became the ADA stated:

Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of a disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker.

H.R.Rep. No. 101–485(II), at 63 (1990), 1990 U.S.C.C.A.N. 303, 345.

1. Here there was evidence that the New York Regional Sales Manager position encompassed the same duties as the Vice President of Sales for Chain Stores but would not have required Connolly to fly. Nor would she have required any retraining.

2. An employer does not discriminate on the basis of disability if it can demonstrate that it did not make a reasonable accommodation because such reasonable accommodation would impose an undue hardship. The jury found that Connolly's reasonable accommodation would not be an undue hardship. (Court Ex. 3 question 2.)

Indeed, though a qualified person with a disability must be able to perform the essential functions of a job, "that inquiry is not limited to the employee's existing job. Rather, the plain language of the statute includes an employee who has the ability to do other jobs within the company that such disabled employee 'desires.'" *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1160–61 (10th Cir. 1999). The jury found that Connolly was a qualified person able to perform the essential functions of a similar, vacant position for which she was qualified. (Court Ex. 3 question 1(c).) Defendants repeatedly characterize the inquiry as whether an employer is required to reassign a disabled employee who "cannot perform the *essential functions of her own job*" (*see, e.g.,* Def. Repl. Mem. at 2; emphasis in original), ignoring that portion of the statute which defines a qualified person with a disability as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*." 42 U.S.C. § 12111(8) (emphasis added).[3] Courts are obliged to give effect, if possible, "to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

Second Circuit precedent also supports the conclusion that an employer is obligated to reassign a qualified employee with a disability who can perform the essential functions of a similar, vacant position even if she can no longer perform the essential functions of her current job. In *Stone v. City of Mt. Vernon*, 118 F.3d 92 (2d Cir. 1997), *cert. denied*, — U.S. —, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998), the court held that "proper analysis of a claim under the federal disability statutes must be focused on 'the fundamental job duties *of the employment position the individual with a disability . . . desires,*' rather than solely on the title held by a person occupying that position or the other positions occupied by most persons holding that title." *Id.* at 99 (quoting 29 C.F.R. § 1630.2(n)(1)) (emphasis added in *Stone*).

The cases cited by defendants are not relevant here because they are interpretations of the Rehabilitation Act as that statute existed prior to its being amended in 1992. In *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court noted that under the Rehabilitation Act employers "are not required to find another job for an employee who is not qualified for the job he or she was doing." *Id.* at 289 n. 19, 107 S.Ct. 1123. Relying on *Arline*, the Second Circuit held that reasonable accommodation does not require reassignment, unless an employee has an contractual right to bid for reassignment. *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035–36 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). However, before 1992 the Rehabilitation Act and the regulations promulgated thereunder did not include reassignment to a vacant position as a possible reasonable accommodation. *See, Mengine v. Runyon*, 114 F.3d 415, 419 n. 3 (3d Cir.1997); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496–97 (7th Cir.1996). Thus, *Arline* and *Bates* are of little persuasive value when considering the reassignment issue under the ADA.[4] Because of the plain meaning of the ADA and the persua-

---

3. Similarly, defendants mischaracterize the EEOC's interpretive guidelines, stating that the EEOC has "limit[ed] application of 'reassignment to a vacant [position]' as a reasonable accommodation to situations when the employee is otherwise qualified *for her own position.*" (Def. Repl. Mem. at 5; emphasis added (citing 29 C.F.R. Pt. 1630 App. § 1630.20(o)).) The guidelines do not reach this conclusion, either explicitly or implicitly.

4. Defendants also rely on *Parisi v. Coca–Cola Bottling Co. of N.Y.*, 995 F.Supp. 298 (E.D.N.Y.1998), *aff'd*, 172 F.3d 38, 1999 WL 66164 (2d Cir.1999), which was an ADA case. However, in concluding that "[t]here is no general duty to transfer a disabled employee unable to perform one job to another available position," *Id.* at 303, Judge Spatt relied specifically on *Bates*.

sive authority of *Stone*, defendants' Rule 50 motion is denied.

## II. *Rule 59*

### A. *Excessive Compensatory Damages*

A less stringent standard is applied to a Rule 59 motion than to a Rule 50 motion for judgment as a matter of law; the "decision whether to grant a new trial on the ground that the verdict was against the weight of the evidence is committed to the sound discretion of the district court." *U.S. East Telecommunications, Inc. v. U.S. West Telecommunications Services, Inc.*, 38 F.3d 1289, 1301 (2d Cir.1994) (citation and internal quotation marks omitted). When exercising its discretion, a trial court may order a new trial if convinced that the verdict is seriously erroneous or against the weight of the evidence. *Id.* A court may also order a new trial where the jury verdict is excessive, in which case the court "may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir.1995); This may be done in cases where the court can identify a particular error made by the jury or where the award is "intrinsically excessive," though a particular error cannot be discerned. *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir.1993). In the latter case, a jury's damage award may not be set aside as excessive unless "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998) (citations and quotation marks omitted).

Here the jury awarded Connolly $50,000 for past pain and suffering and loss of enjoyment of life's pleasures, and $475,000 for past lost wages and benefits. The defendants argue that there was insufficient evidence to support the $475,000 figure and that the jury made a discernible error in arriving at that amount.[5] Connolly earned a salary of $114,000 in her final year in her former position as Vice President of Sales; approximately four years and two months transpired from the time she was terminated until trial. The defendants conclude that the jury multiplied $114,000 times 4.17 (corresponding roughly to four years' and two months' time), which is $475,000. The defendants contend that plaintiff's theory was that she should have been assigned to a similar vacant position, that the only such position at the time Connolly was dismissed paid $66,000, and that there was no evidence at trial that she would have been paid anything other than $66,000 had she been reassigned to that position. They thus argue that the maximum back pay award she could receive, based on the evidence, is $275,000, or $66,000 times 4.17.[6]

The basis for defendants' use of the $66,000 figure is Exhibit 200E, which they contend shows that the similar vacant position to which Connolly might have been reassigned, previously held by Alan Hans, paid that amount. However, Ray Russell, who was Executive Vice President for Sales and Marketing at Great American and Connolly's supervisor, testified that Exhibit 200E was "part of the budgeting process" for 1994, possibly a working sheet, and did not necessarily reflect the actual salaries paid for that year. (Tr. at 1136–39.) There was no evidence at trial that if Connolly had in fact been reassigned to the position in question that she would have been paid $66,000, and there was no evidence concerning Mr. Hans's experience, length of service, or qualifications in comparison to plaintiff's. In other words, it is not clear from Exhibit 200E whether the position in question was budgeted for a $66,000 salary because that is approximately what Mr. Hans was going

---

5. The defendants do not argue against the $50,000 pain and suffering award.

6. However, the defendants did not make this argument to the jury.

to be paid in 1994, or because that is what the position was worth, whoever filled it. Moreover, there is no evidence concerning what the position may have paid in 1995, 1996, 1997, 1998, or the first two months of 1999.

■ There was competent evidence introduced, however, that Connolly had been earning $114,000 in 1994, and that she had had a series of merit increases over her career with Great American; her overall earnings growth was about 18 percent annually. (Pl.Ex. 1; Tr. at 741.) In addition to her salary, in 1994 she received a bonus of $16,000, and as of 1995 her benefits were valued at approximately $13,000. (Tr. at 718.) The purpose of a back pay award is to make a plaintiff whole. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419–422, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The Court instructed the jury in this case that the "amount of wages and benefits due is determined by calculating the amount that would have been earned from the date of plaintiff's discharge to the date you, the jury, return a verdict." (Tr. at 1655.)

As noted above, one could conclude that the jury arrived at the $475,000 figure by multiplying Connolly's $114,000 salary times 4.17, but that is not the only reasonable explanation for the verdict. The jury was instructed to take into account the wages as well as the benefits the plaintiff would have earned had she not been terminated. It is thus possible that the jury took into account (1) that the similar, vacant position in question would have paid Connolly something less than $114,000, but that she would have received raises over time; (2) that Connolly would have been paid more than Hans would have been paid had she taken on that position; and (3) that Connolly also would have earned a bonus and been entitled to benefits of about the same amount as she had previously, with increases each year. Interest on lost pay for the four year period may also have been included. Such a calcula-

tion by the jury could have yielded a final figure of at least $114,000, which is both reasonable and consistent with the evidence. The defendants bear the burden of the uncertainty as to whether the jury engaged in this three-step calculation or whether the jury viewed $114,000 as the salary Connolly would have earned even in the alternative position. The Court instructed the jury to base its calculation on "the amount that would have been earned" (Tr. at 1655), but the defendants did not ask for a more specific instruction. The evidence supports the reasonable calculation that Connolly would have earned $114,000, inclusive of bonus and benefits, for four years and two months after her termination.

■ The defendants also argue that plaintiff's back pay award should be reduced by $85,000, the amount she received under a settlement of a lawsuit based on her rights under a long-term disability insurance policy after she was terminated by Great American. (Tr. at 294–95.) They contend that her receipt of these funds indicates that she was disabled and unable to work; thus, even if she had not been fired by Great American, she was incapable of working and would not have been entitled to her salary during the time she was receiving disability insurance payments. *See Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 145 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). While it is not clear that Connolly would have filed the disability insurance claim if she had not been fired, the $85,000 payment does represent mitigation of her damages.[7]

However, the jury could reasonably have taken the $85,000 into account in its calculation of the final $475,000 back pay award. Specifically, it could have followed the three-step calculation outlined above and determined, consistent with the evidence, that among salary, bonuses, and benefits, Connolly would have earned an average of

---

7. The record does not reflect the attorneys'   fees, if any, charged in that action.

some $135,000 annually over four years and two months. The jury could have then deducted $85,000, making an award of $475,000. Thus, the back pay award of $475,000 will be left undisturbed.

### B. *Punitive Damages*

The jury awarded $350,000 in punitive damages as against Great American only. Punitive damages are recoverable in ADA actions in which "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. American Dental Association*, —— U.S. ——, 119 S.Ct. 2118, 2123, —— L.Ed.2d —— (1999).

In its motion, Great American argues that the punitive damages award should be set aside because, during the relevant time period, it was not clear that Great American was obligated under the law to offer Connolly reassignment to a similar, vacant position or that the Hans position "was a viable 'similar, vacant position.'" (Def. Mem. at 11–13.) However, as noted in Section I, *supra*, the plain meaning of the ADA—which became effective July 26, 1992 [8]—*is* clear as to an employer's obligation to offer a similar vacant position, and at trial defendant James Williams, Great American's President and Chief Executive Officer, did not testify that he had not offered Connolly the job based on his belief that the law did not require him to. Williams did testify that he did not reas-

sign Connolly to the New York Regional Sales Manager position for "primarily one reason. [T]he fact that she had failed in a sales position, I felt like she could not fill another sales position." (Tr. at 1098). This response suggests that he regarded the New York Regional Sales Manager position as having similar duties and thus *was* a viable, similar position. It is also inconsistent with Williams' statement to Ferguson that there was no vacant position which Connolly could fill.[9] Furthermore, the plaintiff presented expert testimony that her satisfactory performance evaluation form had been altered after it was completed in August 1994 to support Williams' conclusion.

The jury rejected Williams' contentions as a pretext for discrimination. Ferguson asked Williams whether there was another job vacant which Connolly could fill, and even though the New York Regional Sales Manager position was available, Williams told Ferguson no. This, plus the fact that the defendants fired Connolly without engaging in the interactive process required by the ADA, was adequate evidence for the jury to conclude that Great American acted in reckless indifference to Connolly's federally protected rights.

The defendants offer no other arguments for why the punitive damages award should be set aside, and the verdict on this point will stand.

### Conclusion

For the foregoing reasons, the defendants' motion is denied in all respects.

IT IS SO ORDERED.

---

**8.** *Velardi v. New York City Fire Department Pension Fund.* 20 F.Supp.2d 623, 625 (S.D.N.Y.1998), *aff'd*, 182 F.3d 902, 1999 WL 377085 (2d Cir. 1999).

**9.** Ferguson, upon learning of Connolly's disability, had previously checked with in-house counsel as to the company's duties under the ADA (Tr. 552–53) and asked Williams if there was a job available for her. (Tr. at 538–39.)