Mandeep WALIA, Plaintiff,

v.

VIVEK PURMASIR & ASSOCIATES, INC. and Vivek Purmasir, Defendants.

No. 95–CV–2428 (RJD).

United States District Court, E.D. New York.

Nov. 15, 2000.

John P. Bostany, Bostany Law Firm, for plaintiff.

Vivek Purmasir & Assoc., Inc., Pro se.

**ORDER**

DEARIE, District Judge.

The Court has received plaintiff's timely objections to certain recommendations of Magistrate Judge Pollak in a Report and Recommendation to the Court dated February 8, 2000. The Court hereby adopts the recommendations of Magistrate Judge Pollak with the following qualifications:

1. Attorney's fees will be paid at the rate of $200 per hour and shall include an additional three and one-half hours of compensable time, with interest at the rate utilized by Magistrate Judge Pollak.

2. Costs are authorized in the amount of $823.25.

Plaintiff's counsel shall submit a proposed judgment within ten days of receipt of this order.

SO ORDERED.

*REPORT AND RECOMMENDATION*

POLLAK, District Judge.

Plaintiff Mandeep Walia filed this action against her former employer, Vivek Purmasir & Associates, Inc., and Vivek Purmasir ("Purmasir"), alleging several claims of sexual harassment, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* and the New York

Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296(1)(a) (McKinney's 1993), based on the conduct of Purmasir during the course of her employment. Following service of the summons and complaint upon defendants and their failure to answer or otherwise move with respect to the complaint, a default was entered on September 21, 1995 by the Honorable Raymond J. Dearie. The matter was subsequently referred to the undersigned to prepare a Report and Recommendation on damages.

### FACTUAL BACKGROUND [1]

Beginning on February 8, 1995, plaintiff Mandeep Walia interviewed for a job as a secretary with Purmasir's company. (Tr. at 5). At the time of the interview, Purmasir, the president of the company, told plaintiff that he operated his business out of his home but that he was in the process of looking for another office. (Tr. at 4–5). He also told plaintiff that he had 20 employees who were involved in conducting a marketing survey of the Indian Community for AT & T. (Tr. at 5). Since plaintiff was attending Queensborough Community College at the time, she was hired to work as a part-time secretary on the weekends, answering the telephones and entering data into the computer. (Tr. at 7). She understood that she was to work 20–25 hours per week at the pay rate of $400.00 per week.

On February 10, 1995, plaintiff began working for Purmasir. Shortly thereafter, she was subjected to a variety of sexual advances by Purmasir. She alleges that on the first day, Purmasir told her, "this is a very friendly place. We work like a family and everything." (Tr. at 10). She alleges that he then began "squeezing [her] cheeks" and telling her that she was "very pretty" and "very sexy." (Tr. at 10). When she protested that she didn't like these comments, he told her "oh, no, it's a family." (Tr. at 10).

Plaintiff testified that on the second day she was working for the company, Purmasir came from behind her while she was typing and held onto her shoulders. (Tr. at 10). She also testified that on that day, she was introduced to an individual who Purmasir said was the vice president of the company, but she could not recall the vice president's name. (Tr. at 10). While the vice president was showing her a computer program, Purmasir, who was setting next to the vice president, said to her, "why don't you come and sit on my lap." (Tr. at 11). Ms. Walia responded "no, thank you," and asked Purmasir not to speak to her like that, to which he responded that he was "just joking." (Tr. at 11).

Although she tried to stay away from Purmasir, on another occasion he showed her a catalogue and told her that he had ordered a cocktail dress for her. (Tr. at 11). Again, Ms. Walia told him that she did not want the dress. At the time of this conversation, Purmasir's wife was in the next room.

According to Ms. Walia, Purmasir had asked Walia out for dinner on several occasions beginning on the first day that she started working at the company. When Walia told him that her parents did not allow her to go out for dinner, he said: "I bought this dress so you could go with the company. Everybody goes here, we all go together, things like that." (Tr. at 12). He also told her that if he hadn't been married, plaintiff would have married him. (Tr. at 12). When she responded by asking, "what makes you think that I would

---

1. The following factual information is derived from the testimony of Mandeep Walia during the inquest hearing held on October 21, 1997 (hereafter "Tr. at ___").

have married you," he responded "because I'm rich and I'm graduated from Harvard." (Tr. at 12).

In addition to offering to buy her a cocktail dress, Purmasir told Walia that he would "buy me anything I want if I will go out with him." (Tr. at 12–13). At this point, Walia had decided that she was going to stop working for Purmasir. However, after speaking to someone else about the harassment she had been experiencing, she decided to try one more day. (Tr. at 13).

On that following day, while Purmasir was moving some documentation from another office, he kept "squeezing [her] cheek." (Tr. at 13). Later in the evening, Walia was in the elevator when: "He just grabbed me from back. I didn't even believe that, grabbing me from the back, squeezing my breasts." (Tr. at 13). She pushed him away with her elbow and told him then that she was going to tell his wife. (Tr. at 13, 14). He pleaded with her not to tell his wife, apologized, and told her he would not do it again. (Tr. at 13). She then left the job.

The following day, Purmasir called Walia and told her to come pick up her paycheck. When she arrived at the office, accompanied by her sister, Purmasir told Walia that he would only give her the check if she would promise not to sue. (Tr. at 13). She refused to agree and left without receiving her pay. At that time, Purmasir also threatened to publish things about her that would bring shame to her if she filed a lawsuit. He told her that he would write that she was a "whore . . . and nobody will marry [her]." (Tr. at 25).

Later, Ms. Walia learned from several sources that Purmasir had been telling "other people" that she was a "whore" and "a slut, things like that." (Tr. at 15). Specifically, she learned that the father of someone who attended school with her worked for Purmasir and repeated these things. She also heard that Purmasir was telling people that he told her not to come to work "because I came to work wearing a shirt with my buttons open all the way down, things like that, that I'm a whore." (Tr. at 16).[2] Purmasir also called her at her house after she filed the lawsuit and told her she was a slut and a whore. (Tr. at 16).

When asked to describe how she felt as a result of these statements, Walia explained that she was "ashamed in school" (Tr. at 15), and that "[i]t's insulting . . . I didn't know what to say to them. Like everybody's laughing at you." (Tr. at 17).

She further explained that in the Indian community, people blame the woman: "Even guy rape you, for example, it won't be the guy's fault. They will say it is the girl's fault. She was a slut or she did something wrong." (Tr. at 17). She testified that other people blamed her for the situation. When she told another woman in the office that she was going to file suit and asked the woman if she would be a witness against Purmasir, the woman said: "oh, no, you shouldn't do that. You know how our community is. . . . I can't, but I give you credit for doing that." (Tr. at 17–18). She told Walia not to bring her name into it. (Tr. at 18).

Walia testified that the retaliation continued and escalated into physical threats. (Tr. at 18). One evening as she was walking home from school, a man grabbed her hand and said "you better drop everything.

---

**2.** Plaintiff introduced into evidence a list of all of the people who repeated Purmasir's statements to her or to her sister. (Court Ex. 2). One of these individuals, Renu Mara, was a television reporter working at the time for a large Indian television station. (Tr. at 24). She knew Purmasir through an interview she had conducted of him.

Otherwise, we will take care of your family." (Tr. at 18). She testified that the man was referring to her lawsuit against Purmasir when he told her to drop everything. (Tr. at 18). After this occurred, Walia did not go to school for several days and when she did return to school, she would walk with someone else because she was frightened. (Tr. at 18–19). Although there were no other physical threats, Purmasir made several phone calls to her house, calling her a whore. When he called, he spoke either to Walia or to her sister.

According to plaintiff, all of these events have had a deleterious effect on her life. Her family was opposed to her decision to bring this lawsuit because they believed she would bring more shame to her family. (Tr. at 22). Her sister, in particular, was angry with her "because in our culture, whatever I do, that will affect my sisters. Tomorrow you are married, your husband will find out." (Tr. at 22).

As a result of Purmasir's threats and defamatory statements, Walia stopped talking to people at school "because people were laughing at me." (Tr. at 26). Eventually, she stopped going to classes altogether because she could not concentrate anymore. (Tr. at 30). Prior to the incident with Purmasir, she had successfully held several jobs as a receptionist/cashier for a travel agency for almost one year, and for the post office, sorting mail on a temporary basis. (Tr. at 28–29). After the incident, she did obtain another job as a receptionist in a little company, where she worked for one or two days. She quit after two days "because—there was nothing happening, but the way the owner was talking, I just—." (Tr. at 27). Later, following the incident, she tried to open her own business—a perfume store—but she never actually worked there. She "just didn't want to do work anymore." (Tr. at 29). She stated: "I couldn't do it, because I just feel like any time anybody make a comment, I used to get—" (Tr. at 29).

She testified that before the incident with Purmasir, she had been "very popular" in her own community, going to concerts and seeing friends. However, after people started mentioning the problems with Purmasir, she stopped seeing them. (Tr. at 30). She also stopped dating. (Tr. at 30). She began to get stomach aches and eventually was admitted to the hospital after she started passing blood in her stools. (Tr. at 33).

In addition to the stomach aches, Walia testified that she started sleeping more. She would stay in her room most of the time. When her sister would tell her a new story about what people were saying, Walia told her she did not want to know. (Tr. at 30). On several occasions, she went to see a psychologist for therapy, Dr. Adrian Merjian, who diagnosed her as suffering from depression. (Tr. at 31–32). In total, Walia incurred $380.00 in hospital charges and $380.00 for psychological counseling.

She testified that although she is trying to put the incident behind her, "[e]verything happens in my sisters'[3] lives and I get blamed because I bring these kinds of things. Again and again being told that I'm bringing shame because of this. It doesn't matter, he's a guy." (Tr. at 36). When she asked the other women to whom he·had done similar things to come forward and support her, they said "you know how it is. We can't get married tomorrow if somebody knows." (Tr. at 36).

Walia says that she can no longer trust anyone. Even though she has not had any

---

3. Walia testified that she had two younger sisters.

problems at the post office where she is working, she testified that "[i]f they make some comment to me, you are pretty or something like that, I feel kind of insulted rather than feeling good that I'm looking good." (Tr. at 36).

She also has moved away from her parents and does not associate with the Indian community anymore. (Tr. at 37). She had a boyfriend, but when he learned about the incident with Purmasir, "he started abusing [her]" (Tr. at 38), and if she was friendly and smiled at other people, he told her that the problem with Purmasir was her fault. (Tr. at 39).

Plaintiff seeks damages for sexual harassment under Title VII and the New York Human Rights Law, as well as $150,000 in damages for battery and intentional infliction of emotional distress. She also seeks her unpaid wages and liquidated damages of $500 under Section 198 of the New York Labor Law and medical expenses totaling $760. Finally, she seeks $800,000 for defamation of character, based on Purmasir's statements that he intended to and did, in fact, defame plaintiff's character.

## DISCUSSION

1. *Hostile Work Environment—Standards*

In order to establish a prima facie case of sexual harassment under Title VII based on a hostile work environment, plaintiff must prove two essential elements. First, the harassing conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *accord Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997). Second, plaintiff must also establish that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d at 149.

In order to determine whether an employee was subjected to conduct sufficient to constitute a hostile work environment, the court must consider "all the circumstances," such as the frequency and severity of the conduct, whether it was physically threatening or humiliating, whether the employee suffered psychological harm, and whether it "unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. 367; *accord Leopold v. Baccarat, Inc.*, 174 F.3d 261, 268 (2d Cir.1999). However, "no single factor is required." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. 367.

Courts employ both an objective and a subjective test to determine whether a hostile work environment existed. *See Leopold v. Baccarat, Inc.*, 174 F.3d at 268. Accordingly, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." [4] *Harris v. Forklift*

---

4. In one case, the Second Circuit appeared to apply, but did not explicitly adopt, "a more contextualized objective standard." *Torres v. Pisano*, 116 F.3d 625, 632–33 n. 6 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). The court noted that several other circuits have already held that the standard governing a hostile work environment claim should be that of a reasonable person with the same fundamental characteristics as plaintiff, such as race, sex, or religion. *See id.* (citing *Newton v. Department of*

*Systems, Inc.*, 510 U.S. at 21, 114 S.Ct. 367. Moreover, plaintiff must also "subjectively perceive the environment to be abusive" for liability to attach. *Id.; accord Schwapp v. Town of Avon*, 118 F.3d at 110. Accordingly, when the plaintiff can show that the harassment unreasonably interfered with her work performance or created "an intimidating, hostile, or offensive working environment," *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) (citations omitted), *rev'd on other grounds Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), plaintiff is entitled to recovery.

Once a plaintiff has established that she was the victim of sexual harassment that altered the conditions of her employment, she must further establish that the harassing conduct should be imputed to her employer and that her employer should be held liable. *See Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992). In the case of alleged harassment by a supervisor, the Supreme Court recently held that employers are presumptively liable for the actions of supervisors.[5] *See Burlington Indus., Inc. v. Ellerth*, 118 S.Ct. at 2270; *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *see*

*also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767 (2d Cir.1998). According to the standards set forth in *Ellerth* and *Faragher*, an employer is liable for the harassing conduct of its supervisors unless it can affirmatively prove: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

### 2. Default

Upon entry of a default judgment, a defendant is deemed to have admitted all of the well-pleaded allegations raised in the complaint pertaining to liability. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); *Montcalm Publ. Corp. v. Ryan*, 807 F.Supp. 975, 977 (S.D.N.Y.1992) (citing *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir.1989); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981); *Deshmukh v. Cook*, 630 F.Supp. 956, 959 (S.D.N.Y.1986); 6 Moore's Federal Practice ¶ 55.03[2] at 55–16 (2d ed.1988)). However, plaintiff

---

the Air Force, 85 F.3d 595, 599 (Fed.Cir. 1996); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 962 n. 3 (8th Cir.1993); *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987)). The court stated that the Supreme Court's decision in *Harris* did not foreclose the use of "a more contextualized objective standard" than the unadorned "reasonable person" standard. *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. at 22–23). However, in a more recent case, *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426 (2d Cir.1999), the Second Circuit rejected such an approach in favor of examining hostile work environment claims from the

perspective of a "reasonable person who is the target of discrimination." *Id.* at 436, n. 3.

**5.** Prior to the Supreme Court's recent decisions in *Ellerth* and *Faragher*, the Second Circuit held that liability would be imputed to the employer only if the plaintiff could establish that: 1) the supervisor was at a sufficiently high level in the company; or 2) the supervisor used his authority to further the harassment; or 3) the employer provided no reasonable avenue for the complaint; or 4) the employer knew or should have known that the harassment was occurring but unreasonably failed to stop it. *See Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998); *Torres v. Pisano*, 116 F.3d at 634.

must still prove damages in an evidentiary proceeding at which the defendant has the opportunity the contest the claimed damages. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty, Corp.*, 973 F.2d at 158. In this case, a hearing on the issue of damages was held before this Court, and although notice of the hearing was sent to the defendants, the defendants failed to appear or present evidence. They have, therefore, conceded liability on those well-pleaded claims in the complaint, and have not availed themselves of the opportunity to challenge the damages sought by plaintiff.

## DAMAGES

### 1. Back Pay

█ Plaintiff seeks an award of back pay for wages she earned while working for Purmasir in February 1995, but which Purmasir never paid her.[6] A plaintiff whose rights have been violated under Title VII is entitled to recover back pay under Section 706(g). 42 U.S.C. § 2000e-5(g). In determining whether to award back pay, the Second Circuit noted in *Carrero v. New York City Housing Authority*, 890 F.2d 569, 580 (2d Cir.1989), that "[a]n award of back pay is the rule, not the exception" because back pay is central to the Congressional intent both to "remove the stain discrimination leaves on equality in the workplace" and "to make victims of discrimination whole."

According to the documentation submitted by plaintiff, she only worked for Pur-

masir for three days at the rate of $400.00 per week. Having considered the evidence presented, this Court respectfully recommends that plaintiff be awarded $600.00 [7] in back pay for lost wages.

Under Title VII, a district court has the discretion to grant prejudgment interest on a back pay award. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993); *Zerilli v. New York City Transit Authority*, 973 F.Supp. 311, 317 (E.D.N.Y.1997). In fact, " 'it is ordinarily an abuse of discretion not to include pre-judgment interest in a back pay award.' " *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d at 145 (quoting *Clarke v. Frank*, 960 F.2d 1146, 1154 (2d Cir. 1992)); *accord Zerilli v. New York City Transit Authority*, 973 F.Supp. at 317. "Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if [prejudgment] interest is compounded." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d at 145. Accordingly, prejudgment interest should be compounded and applied to portions of the back pay award "in a manner that will best reflect the progression, over time, of the damages plaintiff sustained." *O'Quinn v. New York University Med. Ctr.*, 933 F.Supp. 341, 345–46 (S.D.N.Y.1996).

The district court also has discretion to set the appropriate rate of prejudgment interest on a back pay award. *See McIntosh v. Irving Trust Co.*, 873 F.Supp. 872, 882 (S.D.N.Y.1995); *see also Frank v. Relin*, 851 F.Supp. 87 (W.D.N.Y.1994). Many courts in this circuit have set the

---

**6.** Although plaintiff's counsel made some mention of lost wages for the period of February 1995 to November 1996 at the inquest hearing (Tr. at 41), plaintiff did not submit any documentation for such a request. Accordingly, this Court recommends that plaintiff be awarded back pay only for wages she earned while working for Purmasir in February 1995.

**7.** Since plaintiff testified that she was hired to work only on weekends and her pay was $400,00 per week (Tr. at 7, 14), three days of work appears to require reimbursement for one weekend plus one day.

prejudgment interest rate at the United States 52–week treasury bill rate referred to in 28 U.S.C. § 1961(a). *See, e.g., Luciano v. Olsten Corp.,* 912 F.Supp. 663, 677 (E.D.N.Y.1996) (collecting cases), *aff'd.,* 110 F.3d 210 (2d Cir.1997); *Zerilli v. New York City Transit Authority,* 973 F.Supp. at 317; *O'Quinn v. New York University Med. Ctr.,* 933 F.Supp. at 345 (collecting cases); *McIntosh v. Irving Trust Co.,* 873 F.Supp. at 882–83. This Court believes that such a prejudgment interest rate is appropriate in this case because it "adequately ensures that the plaintiff is sufficiently, but not overly, compensated." *McIntosh v. Irving Trust Co.,* 873 F.Supp. at 883.

The average annual United States treasury bill rate applicable from the time of plaintiff's employment— February 1995 to December 31, 1999— is 5.46%. *See id.* at 882–83; *see also* 28 U.S.C. § 1961(a). Applying this prejudgment interest rate, compounded annually, *see McIntosh v. Irving Trust Co.,* 873 F.Supp. at 884, to plaintiff's back pay award for lost salary results in prejudgment interest of $179.31.

Accordingly, this Court respectfully recommends that plaintiff receive an award of back pay for lost wages in the amount of $600.00, plus $179.31 in interest, resulting in a total back pay award of $779.31.

### 2. *Compensatory and Punitive Damages*

Plaintiff also seeks compensatory damages for emotional distress and mental anguish.

Prior to the November 21, 1991 enactment of the 1991 Civil Rights Act, plaintiffs in Title VII actions were not entitled to recover punitive damages, or compensatory damages for personal injury, pain, suffering, or mental anguish. *See Hall v. USAir, Inc.,* No. 96 CV 3944, 1996 WL 705284 at *3 (E.D.N.Y. Nov. 25, 1996). Instead, such plaintiffs were limited to re-

covery of back pay and lost benefits. *See United States v. Burke,* 504 U.S. 229, 240, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992); *Hall v. USAir, Inc.,* 1996 WL 705284 at *3.

■ Section 102 of the 1991 Act created a right for a complaining party to recover compensatory and punitive damages, in addition to the back pay relief already available under Section 706(g). 42 U.S.C. § 1981a(a)(1). This has been read to include compensatory damages for future pecuniary loss, emotional pain and suffering, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. *See McKinnon v. Kwong Wah Restaurant,* 83 F.3d 498, 505 (1st Cir.1996). Here, because plaintiff's cause of action arose after the 1991 amendment, plaintiff is entitled to recover back pay, compensatory damages, and punitive damages.

■ While these types of compensatory damages are now available under Title VII, the Act provides for dollar caps depending upon the size of the defendant employer. Where an employer has more than 14 and fewer than 101 employees, the aggregate total of compensatory and punitive damages may not exceed $50,000. *See* 42 U.S.C. § 1981a(b)(3)(A); *see also Meadows v. Guptill,* 856 F.Supp. 1362, 1371 (D.Ariz.1993).

Here, plaintiff testified that Purmasir told her that he had twenty employees. (Tr. at 5). Thus, under these circumstances, Walia cannot recover more than $50,000 in compensatory and punitive damages on her Title VII claim. However, plaintiff is not precluded from also seeking compensatory damages under the NYHRL. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (holding that, despite Title VII's comprehensive scope, plaintiff is not precluded from other remedies in search of relief); *Alexander v.*

*Gardner–Denver Co.*, 415 U.S. 36, 48–50, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (holding that "Title VII was designed to supplement[,] rather than supplant, existing laws and institutions relating to employment discrimination"); *Anderson v. YARP Restaurant, Inc.*, No. 94 CV 7543, 1997 WL 27043, at *6 (S.D.N.Y. Jan. 23, 1997) (holding that the plaintiff was allowed to recover damages under both Title VII and the NYHRL). Under the NYHRL, plaintiff is entitled to seek compensatory damages, including damages for mental anguish and humiliation. *See Port Washington Police Dist. v. State Div. of Human Rights*, 221 A.D.2d 639, 634 N.Y.S.2d 195 (2d Dep't 1995); *City of Fulton v. New York State Div. of Human Rights*, 221 A.D.2d 971, 633 N.Y.S.2d 914 (4th Dep't 1995); *New York State Dep't of Correctional Servs. v. State Div. of Human Rights*, 207 A.D.2d 585, 615 N.Y.S.2d 531 (3d Dep't 1994).

In awarding compensatory damages for anguish and humiliation, the New York courts have held that the plaintiff may prove such damages through her own testimony "corroborated by reference to the circumstances of the alleged misconduct." *New York City Transit Authority v. State Div. of Human Rights*, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54, 577 N.E.2d 40, 45 (1991). The Court of Appeals has stated that "due to the strong anti-discrimination policy spelled out by the Legislature of this State, an aggrieved individual need not produce the quantum and quality of evidence to prove compensatory damages he would have had to produce under an analogous provision, and this is particularly so where, as here, the discriminatory act is intentionally committed." *Batavia Lodge No. 196, Loyal Order of Moose v. New York State Div. of Human Rights*, 35 N.Y.2d 143, 147, 359 N.Y.S.2d 25, 28, 316 N.E.2d 318, 320 (1974). As the court in *New York City Transit Authority v. State Div. of Human Rights* noted:

[P]sychic injury— by nature essentially subjective—- has prompted difficult questions of proof, both as to establishing the genuiness of any injury and as to fixing its dollars-and-cents valuation.... Such questions have particular pertinence to Human Rights Law cases, where mental suffering is not only compensable ... but also a frequent— sometimes sole— consequence of unlawfully discriminatory conduct.

78 N.Y.2d at 215, 573 N.Y.S.2d at 53, 577 N.E.2d at 44.

Compensatory damages for mental anguish should be awarded in an amount that fairly compensates the victim of discrimination for her injuries. *See Johnson v. Hale*, 13 F.3d 1351, 1352–53 & n. 2 (9th Cir.1994). When awarding such damages, courts "have considered the duration, severity, consequences and physical manifestations of the mental anguish, as well as any treatment that plaintiff underwent as a result of her anguish." *Gleason v. Callanan Industr., Inc.*, 203 A.D.2d 750, 752, 610 N.Y.S.2d 671, 673 (2d Dep't 1994). However, it is not a precondition to recovery that plaintiff underwent treatment, psychiatric or otherwise. *See id.* (quoting *New York City Transit Authority v. State Div. of Human Rights*, 78 N.Y.2d at 216, 573 N.Y.S.2d at 54, 577 N.E.2d at 45). "Although the determination in each case must turn on the facts peculiar to that case, where the damages are necessarily difficult to quantify[,] a comparison to other cases is appropriate." *Portee v. Hastava*, 853 F.Supp. 597, 614–15 (E.D.N.Y. 1994), *aff'd*, 104 F.3d 349 (2d Cir.1996).

In evaluating the reasonableness of an award, courts look to see whether it deviates materially from what would be reasonable compensation. *See, e.g., Shea v. Icelandair*, 925 F.Supp. 1014, 1020–21 (S.D.N.Y.1996). In recent cases, courts

have typically awarded plaintiffs complaining of similar injuries in amounts ranging from $5,000.00 to $65,000.00 as compensatory damages for mental anguish and emotional distress. *See Anderson v. YARP Restaurant, Inc.*, 1997 WL 27043 at *8 (finding an award of $65,000 appropriate where plaintiff suffered sexual harassment for over six months, and sought counseling from a therapist who testified that plaintiff suffered from a sense of powerlessness, panic attacks, sleeping problems, and problems maintaining employment) (and cases cited therein); *Town of Lumberland v. New York State Div. of Human Rights*, 229 A.D.2d 631, 637, 644 N.Y.S.2d 864, 869–70 (2d Dep't 1996) (reducing $150,000 award for emotional distress and humiliation to $20,000 where plaintiff testified she was " 'very, very upset,' 'humiliated,' 'embarrassed to be seen in the town,' she 'couldn't eat,' 'cried' ... 'a mess,' " but did not present any other evidence of the severity and consequences of her condition); *Gleason v. Callanan Industr., Inc.*, 203 A.D.2d at 752, 610 N.Y.S.2d at 673 (finding an award of $54,000 to be supported by the evidence that plaintiff suffered from irritable bowel syndrome, migraines, pains in her sides, insomnia, depression, mental shock, and concerns as a single mother about her ability to support herself and her child); *New York State Dep't of Correctional Servs. v. State Div. of Human Rights*, 207 A.D.2d at 586, 615 N.Y.S.2d at 532 (reducing $25,000 award of compensatory damages for mental anguish and humiliation to $10,000 where there was an absence of proof apart from plaintiff's testimony that she felt depressed and angry, lost sleep, became involved in arguments with her fiancé, and saw a psychiatrist five or six times in 1985); *City of Fulton v. New York State Div. of Human Rights*, 221 A.D.2d 971, 633 N.Y.S.2d 914 (4th Dep't 1995) (finding $50,000 in mental anguish damages to be excessive and award-ing $10,000 where plaintiff felt "very upset and disappointed," "bad," "lost sleep," and was "mean at home"); *Port Washington Police Dist. v. State Div. of Human Rights*, 221 A.D.2d at 640, 634 N.Y.S.2d at 196 (finding award of $200,000 for compensatory damages for mental anguish to be excessive and reducing the award to not exceed $5,000).

 Plaintiff also seeks punitive damages for the harassment that she suffered at the hands of the defendant. However, punitive damages are not subject to recovery under the NYHRL. *See Thoreson v. Penthouse Int'l Ltd.*, 179 A.D.2d 29, 583 N.Y.S.2d 213 (1st Dep't 1992). In *Anderson v. YARP Restaurant, Inc.*, 1997 WL 27043 at *7, the court held that although "plaintiff may not recover compensatory damages in duplicate under both the HRL and Title VII ... plaintiff may, for example, recover compensatory damages only under the HRL and punitive damages only under Title VII." Thus, while plaintiff's damages may be limited to $50,000 in total under Title VII, the court, in its discretion, can divide the award of compensatory and punitive damages between Title VII and the NYHRL in such a way as to maximize plaintiff's overall recovery.

Evidence of the mental anguish and emotional distress suffered by plaintiff came primarily from the testimony of plaintiff herself, buttressed by the expert report of plaintiff's psychologist, Dr. Merjian. (Plaintiff's Affirmation in Support of Claim for Damages ("Pl.'s Aff."), Exhibit E). Plaintiff testified that she suffered humiliation and emotional distress as a result of Purmasir's actions, and her testimony establishes that she has been inhibited from continuing her schooling and from working certain jobs, and that she has been alienated from her family and

from her community. Dr. Merjian's report corroborates this testimony.

■ This case presents a rather unique, and as a consequence, difficult set of circumstances under which to calculate damages. Although the on-the-job harassment experienced by plaintiff was short—only three days—the effects of that harassment have been longstanding and disproportionate as a result of the reaction of plaintiff's family and community. According to plaintiff's testimony, in her culture, the woman is blamed for the man's conduct, regardless of whether the woman was at fault or did anything to precipitate the conduct. This cultural acceptance of Purmasir's lack of responsibility, coupled with his defamatory statements that Walia is a slut and a whore, have been perceived by her family and friends to have brought shame on Walia and on her family. She has been humiliated and laughed at by her former classmates, colleagues, and friends, and has been told on various occasions that neither she or her sisters will ever be able to find husbands because of the shame. As a consequence, Walia felt she was forced to drop out of school, and she moved away from her family. She has had trouble socially with her relationships with men, citing one example of a boyfriend who began to abuse her when he learned of the Purmasir incident.

Additionally, Walia has suffered physical consequences including stomach aches that required hospitalization, sleeping disorders, and depression. These claims are corroborated by the hospital records relating to her treatment for her stomach problems (Court Ex. 5) and the records from her psychologist (Court Ex. 6).[8]

Moreover, the actual incidents of harassment, both during the time she was employed and afterwards, are particularly egregious. She claims that Purmasir invited her to sit on his lap, offered to buy her a cocktail dress, and physically attacked her in the elevator, fondling her breasts. In addition, Purmasir phoned her house on several occasions, made derogatory comments about her to her sister, and threatened her with adverse publicity and physical harm to her family if she insisted on pursing her legal claims.

Having considered her testimony and the supporting evidence, this Court respectfully recommends that plaintiff be awarded $30,000.00 in compensatory damages under the NYHRL for the physical and emotional distress she suffered. In addition, it is respectfully recommended that she be awarded $760.00 for her health care costs incurred as a consequence of the harassment.

■ With respect to punitive damages, it is respectfully recommended that Ms. Walia be awarded $30,000.00 in punitive damages under Title VII based on defendant's conduct in physically assaulting her and deliberately attempting to destroy her reputation in the community. Although no case could be found in which this type of "community censure" was considered in calculating damages, this Court finds that the defendant was fully aware of the reaction that the Indian community would have to his statements about Walia, and that he deliberately undertook to unfairly stain her reputation to prevent her from pursuing her rights and to avoid being held accountable for his own reprehensible conduct. For these reasons, this Court finds

---

**8.** Plaintiff testified that prior to the incident with Purmasir, she never sought psychological treatment for depression, nor had she experienced the stomach aches or sleep problems. (Tr. at 32).

that an award of punitive damages is warranted. *See* 42 U.S.C. § 1981a(b)(1).[9]

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff also seeks damages for intentional infliction of emotional distress by defendants. It is well-settled to Title VII does not pre-empt state common-law remedies, including a claim for intentional infliction of emotional distress. *See* 42 U.S.C. § 2000e–7; *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 217 (N.D.N.Y.1999) (citing *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). Similarly, the New York Human Rights Law does not pre-empt a claim for intentional infliction of emotional distress arising out of sexual harassment in the workplace. *See Funk v. F & K Supply, Inc.*, 43 F.Supp.2d at 218–20 (citing federal and state cases). To succeed on a claim for intentional infliction of emotional distress under New York law, a plaintiff must prove four elements: " '[1] extreme and outrageous conduct; [2] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [3] a causal connection between the conduct and the injury; and [4] severe emotional distress.' " *Id.* at 223 (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993)).

■ This Court finds that the evidence submitted by plaintiff is sufficient to prove each of the four elements of a claim for intentional infliction of emotional distress. However, because the emotional distress and injuries suffered by plaintiff under this claim are the same as those that serve as the basis for the award of compensatory damages under the Human Rights Law, this Court believes that an award of damages under this claim would be duplicative. Accordingly, this Court respectfully recommends that plaintiff not be awarded any damages for her claim of intentional infliction of emotional distress.

## BATTERY

■ Plaintiff seeks damages for battery based on an incident where Purmasir followed her into an elevator, grabbed her from behind, and squeezed her breasts. (Tr. at 13–14). "The elements of a civil 'battery' [under New York law] are: (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent." *Merzon v. County of Suffolk*, 767 F.Supp. 432, 448 (E.D.N.Y.1991).

■ This Court finds that the incident in the elevator where Purmasir grabbed plaintiff from behind and fondled her breasts constitutes intentionally inflicted offensive physical contact sufficient to support a finding that a battery occurred.

9. Plaintiff also seeks an award of liquidated damages equal to 25 percent of the wages owed to her by Purmasir, pursuant to N.Y. Labor Law § 198(1–a) (McKinney's 1986). However, because "liquidated damages under the [N.Y.] Labor Law 'constitute a penalty' to deter an employer's willful withholding of wages due," *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 265 (2d Cir.1999) (quoting *Carter v. Frito–Lay, Inc.*, 74 A.D.2d 550, 425 N.Y.S.2d 115, 116 (1st Dep't 1980), *aff'd*, 52 N.Y.2d 994, 438 N.Y.S.2d 80, 419 N.E.2d 1079 (1981)), awarding both liquidated damages under the N.Y. Labor Law and punitive damages under Title VII would amount to a double recovery for the plaintiff. *See id.; see also Moses v. K–Mart Corp.*, 905 F.Supp. 1054 (S.D.Fla.1995) (striking an award of punitive damages on the basis that the award of both punitive damages pursuant to state civil rights act and liquidated damages pursuant to the federal Age Discrimination in Employment Act constituted double recovery because liquidated damages were "punitive" in nature), *aff'd*, 119 F.3d 10 (11th Cir.1997). Accordingly, this Court recommends that plaintiff not be awarded liquidated damages under the N.Y. Labor Law.

This Court respectfully recommends that plaintiff be awarded $2,500.00 in compensatory damages for the injuries suffered as a result of the battery.

### DEFAMATION

 Plaintiff seeks an award of damages for defamation, alleging that Purmasir made statements about her that amount to slander per se. Under New York law, "[t]here are, generally speaking, four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61–62 (2d Cir.1993). As a rule, slander is not actionable unless the plaintiff suffers special damages, which contemplate the loss of something having economic or pecuniary value. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 434–35, 590 N.Y.S.2d 857, 860, 605 N.E.2d 344, 347 (1992). However, damages are presumed when the defamatory statement takes the form of slander per se. *See Weldy v. Piedmont Airlines, Inc.*, 985 F.2d at 61–62; *Liberman v. Gelstein*, 80 N.Y.2d at 435, 590 N.Y.S.2d at 860–61, 605 N.E.2d at 347–48; N.Y. Civ. Rights Law § 77 (McKinney's 1992). For a defamation claim to fall within the slander per se exception, it must "consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d at 435, 590 N.Y.S.2d at 860, 605 N.E.2d at 347.

 Here, plaintiff alleges that Purmasir committed slander per se by imputing unchastity to her, specifically stating to various members of the Indian community that she was a "whore," "slut," and "things like that." (Tr. at 15–16). Purmasir also told people that he told plaintiff not to come to work anymore because she dressed provocatively, with her "breasts ... showing" (Tr. at 21), and because she was a "whore." (Tr. at 16).

Plaintiff introduced into evidence at the October 21, 1997 hearing a list of all the people who repeated to her or to her sister the statements that Purmasir was making about her (Court Ex. 2). These people included one of Purmasir's employees, who was also the father of one of plaintiff's friends, and Renee Mora, who was a reporter with the largest Indian program on television in the United States. (Tr. at 20–24).

Purmasir also made several telephone calls to plaintiff's family's house, threatening her and telling members of her family that she was a "whore." (Tr. at 16, 19). In addition, on two occasions, Purmasir threatened plaintiff that if she continued with her lawsuit, he would publish defamatory material about her, writing that she was a "whore and everything and that nobody will marry [her]. He would publish things about [her] that could bring shame to [her] if [she] continue[d]." (Tr. at 25).

Plaintiff's testimony regarding Purmasir's statements is corroborated by the affidavit of a private investigator, John E. Naymy. (Naymy Aff.). During a telephone conversation with Purmasir, Mr. Naymy states that Purmasir repeatedly referred to plaintiff as a "whore" and a "slut" and threatened to defame plaintiff throughout the Indian community if she did not withdraw her lawsuit. (Naymy Aff. ¶¶ 3–4).

 Upon a review of the evidence presented in this case, this Court finds that the statements made by defendant Purmasir about Ms. Walia constitute slan-

der per se. *See* N.Y. Civ. Rights Law § 77; *Walmsley v. Kopczynski,* 202 A.D. 104, 195 N.Y.S. 699 (3d Dep't 1922); *Courtney v. Mannheim,* 14 N.Y.S. 929 (City Court of Brooklyn, General Term 1891) (holding that word "whore" is slanderous per se under New York Law). Purmasir made numerous defamatory statements to others that necessarily imputed unchastity to plaintiff. Although Purmasir's statements caused plaintiff emotional pain and anguish, this Court recommends that plaintiff not be awarded any damages for emotional distress under this claim because it has already recommended that plaintiff be compensated for her emotional injuries under her N.Y.H.R.L. claim. *See Zolondek v. Morgan,* 141 A.D.2d 632, 529 N.Y.S.2d · 1000 (2d. Dep't 1988) (noting that "there can only be one recovery for any damages based upon emotional distress resulting from alleged slanderous statements"). This Court does respectfully recommended that plaintiff be awarded damages in the amount of $20,000.00 to compensate her for the harm done to her reputation and her standing in the community.

## ATTORNEY'S FEES

Under Title VII, a district court is authorized to award reasonable attorney's fees to the prevailing party in an employment discrimination action. *See* 42 U.S.C. § 2000e–5(k). While an award of attorney's fees under the statute is discretionary, such fees should be awarded to prevailing parties in all but exceptional circumstances. *See Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir.

1980), *overruled on other grounds, Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549 (11th Cir.1983); *see also DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985) (holding that, in awarding attorney's fees under 42 U.S.C. § 1988, there is a "presumption that successful civil rights litigants should recover reasonable attorney's fees unless special circumstances render such an award unjust").[10] There are no special circumstances here that would render an award of attorney's fees unjust in this case.

Generally, the proper measure for a fee award is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," *Hensley v. Eckerhart,* 461 U.S. at 433, 103 S.Ct. 1933, otherwise referred to as the "lodestar" amount. A district court is required to state specific reasons if it chooses either to augment or reduce the lodestar figure. *See DiFilippo v. Morizio,* 759 F.2d at 234 (citations omitted). A reasonable hourly rate is one that is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson,* 465 U.S. 886, 896, n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In calculating the number of hours reasonably expended on a particular case, the court should look to " 'its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.' " *Clarke v. Frank,* 960 F.2d 1146, 1153 (2d Cir.1992) (quoting *DiFilippo v. Morizio,* 759 F.2d at 236). Using the time records submitted

**10.** In *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1988), the Supreme Court noted that the provision for awarding attorney's fees under 42 U.S.C. § 1988 was patterned upon the provisions contained in Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b),

2000e–5(k), and Section 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973(e). Consequently, the standards for awarding attorney's fees to a "prevailing party" under Title VII and 42 U.S.C. § 1988 are the same. *See id.*

by the party seeking attorney's fees as a "benchmark, the court should exclude all time that is excessive, duplicative, or inadequately documented." *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir.1993), *on remand,* 852 F.Supp. 542 (S.D.Miss.1994), *aff'd,* 49 F.3d 728 (5th Cir.1995).

It is well-established in this circuit that an attorney "who applies for court-ordered compensation ... must document the application with contemporaneous time records ... specifiy[ing], for each attorney, the date, the hours expended, and the nature of the work done." *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983); *accord, Soliman v. Ebasco Servs. Inc.,* 822 F.2d 320, 323 (2d Cir.1987); *Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986). The burden is on the attorney to maintain and provide contemporaneous records, *see F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987), and a failure to adequately document the fee application will result in a denial of the application. *See Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 53 (2d Cir.1992).

Plaintiff's counsel, John P. Bostany, Esq., has applied for attorney's fees for 39½ hours of work at $200.00 per hour, for a total of $7,900.00 in attorney's fees. Mr. Bostany has submitted a letter to support his fee application. ("Bostany Letter"). That letter provides information regarding the specific tasks performed by Mr. Bostany, the date the tasks were performed, the time required to complete each task, and the hourly rate changed for each task.

Although the information provided in Mr. Bostany's letter does not appear to be a contemporaneous time record, it does appear to be a verbatim transcription of the entries from his contemporaneous time records for this case, which would be sufficient to meet the requirements set forth by the Second Circuit in *Carey. See, e.g.,*

*Pastre v. Weber,* 800 F.Supp. 1120, 1124 (S.D.N.Y.1991); *Lenihan v. City of New York,* 640 F.Supp. 822, 824 (S.D.N.Y.1986). However, nowhere in his letter does Mr. Bostany specifically state that this information is a verbatim transcription of his contemporaneous time records. Therefore, this Court respectfully recommends that in order for plaintiff to be awarded attorney's fees, Mr. Bostany should be required to first submit an affidavit affirming that the information contained in his letter is a verbatim transcription of the entries from his contemporaneous time records for this case.

A review of the information provided by Mr. Bostany reveals that, overall, the time spent on this case was not excessive in relation to the tasks performed. Although this is not a complex case, nor does it involve any novel issues of law, plaintiff's attorney was required to meet with his client to determine the facts pertaining to her claims; to hire a private investigator to investigate Purmasir's business; to contact Purmasir and discuss the case with him several times; to perform a minimal level of research in the area of sexual harassment law, New York Labor Law, and the law of various common law torts; and to draft a complaint. After the defendants failed to appear, plaintiff's counsel promptly moved for a default judgment. Following the issuance of the order granting the default, plaintiff's attorney was required to establish plaintiff's entitlement to an award of damages, including preparing for and participating in the hearing held by this Court on October 21, 1997.

This Court finds, however, that the time claimed by plaintiff's attorney for certain tasks is excessive. Specifically, the time claimed for receiving and reviewing orders of the court, for performing some of the legal research, and for preparing inquest submissions appears to be excessive.

(Bostany Letter at 3–5). Accordingly, this Court respectfully recommends that an award of attorney's fees to plaintiff be based on a total of 32 hours.

With respect to plaintiff's counsel's hourly rate, plaintiff has failed to submit any evidence concerning her attorney's experience with similar cases or of the prevailing rates charged by New York civil rights attorneys with the skill, experience, and reputation comparable to her counsel. The rate requested for the time spent by counsel in this action appears somewhat high. *See Cabrera v. Fischler*, 814 F.Supp. 269, 288–289 (E.D.N.Y.1993) (collecting cases that discuss appropriate rates for attorney's fees in housing discrimination cases). Having reviewed the law in this Circuit, this Court respectfully recommends that an award of attorney's fees be based on an hourly rate of $175.00 per hour.

Accordingly, this Court respectfully recommends that plaintiff be awarded attorney's fees in the amount of $5,600.00, representing 32 hours at the rate of $175.00 per hour, pending the submission by Mr. Bostany of the Affidavit discussed above. This Court also recommends an award of interest on the award for attorney's fees in the amount of $1,147.59 to compensate for delay in payment, *see, e.g., Copeland v. Marshall*, 641 F.2d 880, 893 (D.C.Cir.1980) (en banc); *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 764 n. 6 (7th Cir.1982), *cert. denied*, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Shaw v. Library of Congress*, 747 F.2d 1469, 1475 (D.C.Cir. 1984), *rev'd on other grounds*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), resulting in a total award of attorney's fees of $6,747.59.

### COSTS AND DISBURSEMENTS

Under Title VII, a district court is authorized to award costs and expenses to the prevailing party in an employment discrimination action. *See* 42 U.S.C. § 2000e–5(k); *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981); *Cosgrove v. Sears, Roebuck & Co.*, 191 F.3d 98 (2d Cir.1999). When a plaintiff prevails in a civil rights action, the court will generally award plaintiff any reasonable out-of-pocket expenses incurred by her attorney that would normally be charged to the attorney's fee-paying clients. *See Cabrera v. Fischler*, 814 F.Supp. at 291 (citing *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir.1987)). Here, plaintiff seeks an award of costs in the amount of $443.25, excluding medical costs. (Bostany Letter at 5–6). Upon review, this Court finds these costs to be reasonable expenses and respectfully recommends that plaintiff be awarded $443.25 in costs.

### CONCLUSION

For the foregoing reasons, this Court respectfully recommends that plaintiff be awarded $779.31 in back pay, $30,760.00 in compensatory damages, $30,000.00 in punitive damages, $2,500.00 in damages for battery, $20,000.00 in damages for defamation, attorney's fees in the amount of $6,747.59, and $443.25 in costs, totaling $91,230.15.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

SO ORDERED.