**Rose CIOFFI, Plaintiff,**

v.

**NEW YORK COMMUNITY
BANK, Defendant.**

**No. CV 04–2527(ADS).**

United States District Court,
E.D. New York.

Dec. 18, 2006.

Raymond Nardo, Esq., Mineola, NY, for Plaintiff.

Nixon Peabody, LLP, Garden City, NY by Joseph T. Ortego, Esq., James P. O'Brien, Jr., Esq., Christopher G. Gegurch, Esq., for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Following a jury trial and verdict, the defendant New York Community Bank (the "defendant" or the "NYCB" or the "Bank") moves for (1) judgment as a matter of law pursuant to Federal Rule of Civil Procedure (Fed.R.Civ.P.) 50(a), and (2) judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or in the alternative, for a new trial and/or remittitur of the jury's award of punitive damages, pursuant to Fed.R.Civ.P. 59.

In addition, the plaintiff has moved for an order, (1) pursuant to 42 U.S.C. § 1988 for counsel fees, (2) pursuant to 28 U.S.C. § 1961 for prejudgment interest, and (3) pursuant to Fed.R.Civ.P. 15 to amend the caption.

The Court will address each of these motions in order.

## I. BACKGROUND

The plaintiff Rose Cioffi (the "plaintiff" or "Cioffi") was employed in April 2001 by NYCB as a Help Desk Manager in the Bank's Information Technology ("IT") Department. In her amended complaint, and at the trial, Cioffi claims to have been sexually harassed by Kenneth Yarmosh, a consultant in the Bank's IT Department who later became her supervisor. As a result of this perceived conduct by Yarmosh, on November 22, 2002, Cioffi made a complaint of sexual harassment to Jo-Anne Camacho, a Vice President in the Bank's Human Resources Department. She made a second complaint on December 2, 2002. After those complaints, Cioffi contends that the Bank took every opportunity to make her workplace unpleasant and intolerable and compelled her to resign her position with the Bank on January 27, 2003.

Two causes of action were presented to the jury under Title VII and the New York Human Rights Law: (1) female gender discrimination in the form of sexual harassment and a hostile work environment; and (2) retaliation leading to her constructive discharge. The jury rendered a verdict in which it found in favor of the Bank on the sexual harassment-hostile work environment cause of action. In addition, the jury found in favor of Cioffi on the retaliation-constructive discharge cause of action and awarded her $125,000 for back pay and $195,000 in punitive damages. These motions followed.

## II. AS TO THE DEFENDANT'S RULE 50 MOTIONS

### A. The Standards

Under the provisions of Fed.R.Civ.P. 50(a) a motion for judgment as a matter of law may be made at any time "before submission of the case to the jury." Counsel for the Bank did make a Rule 50(a) motion prior to the submission of the case to the jury and it was denied. The Bank is now renewing that Rule 50(a) motion.

However, the Court will determine the Rule 50(a) motion at the same time as its decision concerning the Rule 50(b) motion,

which is more properly before the Court following the verdict.

In pertinent part, Rule 50(b) provides as follows:

(b) Renewing Motion for Judgment After Trial;

Alternative Motion for New Trial.

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter or law.

■■■ A district court may not grant a judgment as a matter of law unless "the evidence is such, that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cruz v. Local Union No. 3 Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154–55 (2d Cir.1994) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party. *See Fairbrother v. Morrison,* 412 F.3d 39, 48 (2d Cir.2005); *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998).

■■■ Stated somewhat differently, we are "required to 'consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)). A court evaluating such a motion "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* at 70 (quoting *Smith,* 861 F.2d at 367); *Black v. Finantra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir.2005).

■■■ Finally, the Court is mindful that motions pursuant to Rule 50 "should be cautiously and sparingly granted." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524 (2d ed.1994). "[W]e may reverse the district court only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [him]." *Nimely v. City of New York,* 414 F.3d 381, 390 (2d Cir.2005).

**B. As to the Proof of "Constructive Discharge"**

In the retaliation cause of action the Court charged the jury that the plaintiff was required to prove that: (1) she engaged in protected activity opposing discrimination; (2) the Bank was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action.

■ The Court instructed the jury that plaintiff had established the first two elements of her retaliation claim; namely, that she participated in protected activity opposing discrimination when she made her November 22, 2002 and December 2, 2002 complaints to Ms. Camacho, and NYCB was aware of these complaints. With respect to the third element of her retaliation claim, that plaintiff suffered an adverse employment action, the Court instructed the jury that "[t]he contention of the plaintiff is that the adverse employment decision was her constructive discharge on January 27, 2003." In sum, in order to find that NYCB had retaliated against Cioffi, the jury had to find that Cioffi established that she was constructively discharged. The jury did so find. The defendant contends that there was no legally sufficient evidence that would permit a reasonable jury to find in plaintiff's favor that she was constructively discharged, requiring dismissal of the sole claim on which the plaintiff prevailed. The Court disagrees.

■ The legal definition of a "constructive discharge" is well-defined in the Second Circuit cases. As set forth in *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir.2000): "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *See also Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir.2006) ("A plaintiff's claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' *Pa. State Police v.*

*Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Upon that showing, the employee's decision to resign 'is assimilated to a formal discharge for remedial purposes.' "); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998) (same).

■ Stating the rule on constructive discharge is relatively simple because it is generally accepted in all the cases. However, it is the practical application of the rule in actual everyday life in the workplace, which forms the basis for such a determination. As set forth in a major decision in this field, *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 90 (2d Cir.1996), in some cases it is the cumulative effect of adverse conditions, which when taken singly, would not suffice to make out a constructive discharge. In *Chertkova*, this important portion of the rule was clearly set forth:

It is true that if only one of the work conditions enumerated by the district court were present, it might not be enough to demonstrate constructive discharge. Certain factors, standing alone, are legally insufficient to support constructive discharge. *See, e.g., Stetson*, 995 F.2d at 360 (dissatisfaction with assignments; employee's perception of undue criticism or excessive monitoring; difficult or unpleasant conditions); *Pena*, 702 F.2d at 325 (disagreement with work plan). But the effect of a number of adverse conditions in the workplace is cumulative. A constructive discharge occurs if a reasonable person *subjected to the same conditions as the plaintiff* would have felt compelled to step down. Because a *reasonable person* encounters life's circumstances cumulatively and not individually, it was error to treat the various conditions as separate and distinct rather than additive. Viewed as a whole, the facts in the case

at hand, if proven, would permit a finder of fact to conclude that Chertkova was forced to resign.

92 F.3d at 90.

A review of the facts in *Chertkova,* leading to the *prima facie* constructive discharge determination, reveals a similar factual situation to the case at issue. In *Chertkova,* the plaintiff's working conditions were made intolerable by her supervisor. He yelled at her in insulting terms during coaching sessions, telling her, "Do you think you are going to outlive us? There is no chance. You are not going to be here." He also told the plaintiff she was "too expensive" and mocked her when she told him she was at the bottom of the pay range. Despite a strong performance, Ms. Chertkova was treated arbitrarily and severely criticized. She was told she would be fired if, over the course of two years, she did not maintain satisfactory performance levels and improve her listening skills. In sum, her supervisor engaged in a pattern of baseless criticism; said she would not "be around"; and warned her that she would be fired if she did not meet certain ambiguous behavior objectives.

Also, in *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987) a supervisor told the plaintiff that he would be fired at the end of the probationary period, no matter what he did to improve. The Court held that "A trier of fact might find that Hirnsberger's statement alone suffices to establish a constructive discharge."

In the Court's view, the facts confronting Cioffi—giving every inference to the plaintiff—were even more unpleasant and intolerable for her. Here, we have a young woman who is hired by NYCB as a Help Desk Manager and Assistant Vice President on April 3, 2001. By December 2001, she is promoted to the position of Second Vice President and receives a pay raise of $5,000 per year plus stock options.

Further, Human Resources marks her record for "promotion."

Problems arise when she believes that her supervisor Kenneth Yarmosh was sexually harassing her. Cioffi makes a complaint of sexual harassment against Yarmosh to Jo Ann Camacho, a Vice President in the Bank's Human Resources Department, on November 22, 2002. At the time she was "visibly upset" and cried throughout almost the entire meeting (Tr. at 718; 828–829). Cioffi again complained to Human Resources on December 2, 2002, during which time she was again "visibly upset. She was crying" (Tr. at 733).

The record indicates that after her complaint of sexual harassment against Yarmosh, everything went bad for Cioffi. After taking a scheduled vacation and while awaiting the outcome of the sexual harassment investigation, Cioffi returned to work on December 11, 2002. During the next forty days, Cioffi testified to many unpleasant changes in her working conditions. Yarmosh came to Camacho's office and stated that Cioffi was fabricating "a lot of this in retaliation ... for his efforts to manage some performance and attendance problems that he was having with her" (Tr. at 722). On December 4, 2002, Yarmosh had come to Human Resources to discuss the delivery of a disciplinary warning to Cioffi. Yarmosh stated that he was having problems with Cioffi as to her performance, her attitude and her attendance. He claimed that "Rose had been taking time off, either sick time or other time" and not recording it properly on his time sheets. He also told Camacho that while they were in a car together, Cioffi "reached over and touched the inner part of his thigh" (Tr. at 727).

Yarmosh also brought in to Camacho a draft discipline threatening Cioffi's termination (Plf.Ex.34). In this document, Yarmosh stated the following:

Rose needs to rapidly demonstrate a complete change in her work attitude and show a team spirit. Her demeanor over the course of the last several months is contrary to what she has normally displayed in the past. She usually is very personable/affable.

A final warning followed by employment termination.

The Camacho investigation of Cioffi's complaints of sexual harassment by Yarmosh was, at best, innocuous. Camacho spoke to Yarmosh and the Chief Information Officer Robert Brown. Strangely, Camacho never interviewed Danny Palvantonio, the sole "eyewitness" who was the only co-employee who could corroborate Cioffi's claim of sexual harassment. He allegedly heard Yarmosh state that he wanted to take Cioffi to Tahiti with him. Camacho never talked to the sole independent witness in Cioffi's sexual harassment claim. Without that interview, the investigation was inadequate and incomplete.

When Cioffi returned to work on December 18, 2002, things got worse at the Bank. None of her fellow employees greeted her. She was interrogated, disciplined and immediately stripped of her important timekeeping duties without prior warning. Camacho advised Robert Brown to warn Cioffi that this type of "falsification" of the time sheets and "misconduct" could lead to "disciplinary action" (Plf.Ex.6). Brown threatened to terminate Cioffi over the timekeeping issues. ("As I told you when we met to discuss this, further incidents of this type will not be tolerated and will result in disciplinary action up to and including termination") (Plf.Ex.13).

All of these events occurred immediately following Cioffi's complaint of sexual harassment. More was yet to come. After her complaints of sexual harassment, NYCB reassigned her and her prior duties were removed. Worse yet, she was compelled to work on a new and difficult assignment, the AT & T Migration Project, which was headed by Kenneth Yarmosh, her accused sexual harasser. When Cioffi was given this assignment by her main supervisor, Robert Brown, he again threatened to terminate her, in a very unpleasant manner:

Q What were you told?

A I was told that the AT & T migration project was very critical to the bank, and that I was to handle all of the phone calls that came in from the telco techs out in the field.

And I was to sit at my desk and not move, because if I messed up, my ass was on the line.

Q Who told you that?

A Robert Brown.

Tr. at 442–443.

So that Second Vice President Cioffi, armed with a raise and stock options prior to the complaints, was reassigned to the mundane and somewhat humiliating task of sitting at a desk awaiting telephone calls, while her other more interesting and productive duties were reassigned. While all this was going on other punishments to Cioffi were instituted. Cioffi was a born-again Christian and had requested permission to visit Cuba on a mission with her church. Originally, Brown had approved this request. Cioffi relied on this approval and raised $1,000 from sponsors. Then Human Resources intervened and rejected Cioffi's request to go to Cuba claiming that there was a policy that prohibited first quarter vacations. Apparently, the Bank invoked a non-existent policy prohibiting first-quarter vacations so as to prevent Cioffi from making this Cuban church mission. From the statement in a memorandum from Director of Human Resources Bernard Terlizzi to Camacho dated February 13, 2003, it is apparent that this "no first quarter vacation" policy was directed solely against Cioffi:

Ken told Rod that he could take his vacation, and when Rod asked Ken about the "no vacation" email to the IT Department, he was told that this was directed to Rose, and that he did not need to worry about the email. (Plf.Ex.41.)

It could be inferred by a reasonably prudent juror that, by selectively invoking a non-existent policy to prevent Cioffi from attending a rare religious mission, coupled with the other post-complaint detrimental acts, there was a concerted effort to make her workplace intolerable. More was to come. Post-complaint, additional serious problems developed for Cioffi. NYCB permitted Kenneth Yarmosh, the accused harasser, to draft Cioffi's performance evaluation. Although only two months earlier Yarmosh promised her the possibility of a 25% raise and stock options equaling her entire salary (Plf.Ex.24A), and she was marked for "promotion" by Human Resources, everything changed after her complaints. In her evaluation by Yarmosh, Cioffi failed to meet expectations in all but one category. However, Brown downgraded that category, so that Cioffi failed to meet expectations in all categories (Plf.Ex.13). Camacho testified that it was a "very poor performance review" (Tr. at 758). The evaluation again threatened Cioffi's termination and required that she coordinate with her alleged harasser, Kenneth Yarmosh.

Without prior notice, Cioffi was summoned to meet with Brown and Terlizzi to discuss this "very poor performance review." As Brown testified, she failed to meet expectations in all categories:

Q My question is: When that meeting was over, Rose Cioffi still did not meet expectations in any of the five categories; is that right?
A Correct.

After receiving this poor performance evaluation, Cioffi, apparently, could not re-turn to work for several days. She wrote in her diary:

My eyes are swollen from crying since I left work, the worst review I ever got in my life, the strengths were a slap in the face. It's too much ... I'm exhausted, but I must go in tomorrow. I cannot bear this burden any longer, nor do I want to. (Dft.Ex.AL.)

As a result of these forty days of conduct on the part of the Bank that could be viewed as retaliation after her complaints of sexual harassment, Cioffi gave notice on January 27, 2003. Although she gave two weeks notice, the Bank had her escorted out of the Bank on that very day, January 27th, in the middle of the workday. Interestingly, with regard to the issue of constructive discharge, in August 2003, Joseph Ficaloro, the President of the Bank, advised an investigating detective, that Cioffi "was fired by the company based on a bad performance recommendation made by Ken Yarmosh" (Plf.Ex. 22).

Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. As stated in *Chertkova,* "working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign." 92 F.3d at 89; *see also Lopez v. S.B. Thomas, Inc.,* 831 F.2d at 1188.

Here, considering the evidence in the light most favorable to the plaintiff and affording her the benefit of all reasonable inferences that the jury might have drawn from the evidence, *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir.2001), a reasonable jury could have determined that the plaintiff Rose Cioffi was constructively discharged by the NYCB. Accordingly, the defendant's Rule 50(b) motion for judg-

ment as a matter of law on the constructive discharge issue, is denied.

## C. *As to the Punitive Damages Award*

NYCB also moves for judgment as a matter of law dismissing the award of punitive damages on the ground that it made good faith efforts to comply with Title VII. In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 546, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) the Supreme Court recognized an affirmative defense which insulates an employer from punitive damages liability if it has made "good faith efforts to enforce an anti-discrimination policy." "This defense requires an employer to establish both that it had an anti-discrimination policy and that it made a good faith effort to enforce it.... Where evidence supports both components of the defense, an employer is entitled to have the defense considered by the jury under proper instructions." *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001).

### 1) *As to Waiver—Failure to Object*

■ In this case, the defendant failed to object to the jury instructions on punitive damages which did not include a *Kolstad* good faith defense. Fed.R.Civ.P. 51 provides for objections to the charge. In the absence of a properly specific objection under Rule 51, a party ordinarily cannot claim on appeal that the trial court erred in giving an erroneous instruction or the failure to give a particular instruction. However, Rule 51 goes on to say that a court may consider "plain error" in the instructions affecting substantial rights that have not been preserved. In the Second Circuit, the Court may review a "missing" instruction for "fundamental error" only. The rule as stated in *Fashion Boutique of Short Hills v. Fendi USA, Inc.*, 314 F.3d 48, 61 (2d Cir.2002) is as follows:

> Under Rule 51 of the Federal Rules of Civil Procedure, a party in a civil action must make specific objections to jury instructions before the jury retires to deliberate. *See* Fed.R.Civ.P. 51; *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir.2002). The failure to so object results in waiver, in which case this court may review the instruction for "fundamental error" only. *See Jarvis*, 283 F.3d at 62. Fundamental error is a more exacting standard than the "plain error" standard in the criminal context and must be "so serious and flagrant that it goes to the very integrity of the trial." *Shade v. Hous. Auth. Of New Haven*, 251 F.3d 307, 312 (2d Cir.2001).

We find no error, much less fundamental error, in the jury instructions on general damages.

■ In this case, the Court finds that there was no fundamental error in the Court's charge on punitive damages which did not discuss the *Kolstad* affirmative defense. A case which demonstrates the extent to which the error must go is *Metromedia Company v. Fugazy*, 983 F.2d 350, 362, 364 (2d Cir.1992). In *Metromedia*, a civil RICO case, the jury was not instructed "as to the need to find willfulness," a major element in this type of case. The Court stated the standard as, "absent objection, an error may be pursued on appeal only if it is 'plain error' that may result in a miscarriage of justice in 'obvious instances of ... misapplied law.'" The Court found no such "plain error." "We conclude that had the jury been so instructed in the present case, it could easily have found that William's violation of § 12(2) was willful." *Id.* at 364.

### 2. *The Defense Was Not Established*

The same *Metromedia* reasoning is applicable in this case. As stated below, had the jury been instructed in the *Kolstad* defense, it could easily have found that the defendant failed to take good faith efforts

to enforce its anti-discrimination policy with regard to Cioffi and her complaints of sexual harassment. On the merits, the "good faith enforcement" defense was not established.

 An employer's written anti-discrimination policy, by itself, is not enough to establish the good faith enforcement defense. *Zimmermann,* 251 F.3d at 385; *Kuper v. Empire Blue Cross & Blue Shield,* No. 99 Civ. 1190, 2003 WL 359462 at *5–6 (S.D.N.Y. Feb. 18, 2003). To avail itself of this defense, an employer must show good faith efforts to enforce its anti-discrimination policy. *Zimmermann,* 251 F.3d at 385. Although in this case there is proof of an anti-discrimination policy, there was insufficient evidence of a good faith enforcement with respect to the plaintiff. In the Court's view, a reasonable jury could not find such good faith enforcement.

The cases demonstrate examples of a failure to demonstrate a good faith effort to enforce an anti-discrimination policy. Were reasonable steps taken by Camacho and Terlizzi to adequately investigate this complaint or to punish or reprimand the harasser or to take any reasonable steps to prevent future similar conduct? The evidence adduced at this trial is to the contrary.

To begin with, Camacho refused to interview the one so-called eyewitness who could corroborate Cioffi's claim of sexual harassment. Also, it appears that Camacho accepted Yarmosh's version of the events at issue; did not question him as to inconsistencies; and did not permit Cioffi to respond to Yarmosh's statements. There was no attempt to discipline Yarmosh; not even a letter in his file. Further, the Human Resources Department, which had the duty to enforce the Bank's compliance with federal anti-discrimination law, was itself involved in retaliatory actions against Cioffi. Camacho advised Robert Brown in

writing to warn Cioffi that her misconduct "will require formal disciplinary action" (Plf.Ex.6). Bernard Terlizzi, the Director of Human Resources, summoned Cioffi to a meeting with him and Brown where she had to defend herself with regard to a newly drawn negative performance review written by Yarmosh, her alleged harasser. Terlizzi then rejected Cioffi's church-oriented vacation request after it was approved by Brown. Cioffi was told that this policy to deny first quarter vacation would only apply to her (Plf. Ex 42, Tr. 1013–1014). Also, Brown, her main supervisor, repeatedly threatened her with termination after her complaints of sexual harassment. All of these acts were done after Cioffi's complaints and within a period of forty days. The proof of good faith efforts by the Bank and its Human Resources Department to enforce its anti-discrimination policy, was lacking.

In this case, in view of the undisputed factual scenario, the failure to include the *Kolstad* defense in the punitive damages charge, where there was no request or objection by the defendant, did not result in "plain error" or "fundamental error," that went "to the very integrity of the trial."

Accordingly, the defendant's motion for judgment as a matter of law dismissing the award of punitive damages on the ground that it made good faith efforts to comply with Title VII, is denied.

**D. *The Jury's Punitive Damage Award Was Not Excessive***

 Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition" *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991). An award of punitive damages should be reversed only if it is "so high as

to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 883 (2d Cir.) *cert. denied* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).

In *BMW of North America v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court identified three "guideposts" for determining whether a punitive damage award is excessive: (1) The degree of reprehensibility; (2) the disparity between the harm or potential harm and the punitive damages award namely, the proportion or ratio of punitive damages to compensatory damages; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases.

As to reprehensibility, the Court instructed the jury to award punitive damages only if it found that the defendant acted maliciously, wantonly or oppressively, and it defined each of these elements. In addition to *Kolstad* punitive damages have been awarded in many employment discrimination cases, based on the same general reprehensive discriminatory conduct. See for example, *Zimmermann,* 251 F.3d at 376; and *Connolly v. Bidermann Industries Inc.,* 56 F.Supp.2d 360, 369 (S.D.N.Y.1999). In *Connolly,* the Court stated:

> The jury awarded $350,000 in punitive damages as against Great American only. Punitive damages are recoverable in ADA actions in which "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its aware-

ness that it is engaging in discrimination." *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 2123, 144 L.Ed.2d 494 (1999).

The jury rejected Williams' contentions as a pretext for discrimination. Ferguson asked Williams whether there was another job vacant which Connolly could fill, and even though the New York Regional Sales Manager position was available, Williams told Ferguson no. This, plus the fact that the defendants fired Connolly without engaging in the interactive process required by the ADA, was adequate evidence for the jury to conclude that Great American acted in reckless indifference to Connolly's federally protected rights.

Also, the proportion or ratio of the punitive damages to the compensatory damages is surely within all the bounds set by the Supreme Court. In this regard, this assessment can be done with back pay damages. See *Parrish v. Sollecito,* 280 F.Supp.2d 145 (S.D.N.Y.2003) ($150,000 for the back-pay and $500,000 in punitive damages—reduced by cap); *Kuper* 2003 WL 359462 at *9 ("[C]ourts have held that back pay in discrimination cases is part of the harm suffered by plaintiff facing employment discrimination ... Therefore the Court includes the back pay award in the total compensatory damages award."); *Greenbaum v. Handelsbanken,* 67 F.Supp.2d 228 (S.D.N.Y.1999) (awarding $320,000 for back pay and $1,250,000 in punitive damages); *Iannone v. Frederic R. Harris Inc.,* 941 F.Supp. 403, 415 (S.D.N.Y.1996) ("[U]nlike the assessment made in a traditional personal injury action, the magnitude of injury to the plaintiff in a Title VII action is not measured solely by the award of compensatory damages; it is also reflected in the size of the back pay award.")

In any event, it was held in *Cush–Crawford v. Adchem Corp.*, 271 F.3d 352, 357 (2d Cir.2001) that "(a)n award of actual or nominal damages is not a prerequisite for an award of punitive damages in Title VII cases." As stated in *Cush–Crawford*:

> In Title VII cases, we see no reason to make award of actual or nominal damages. We hold that in Title VII cases, where the fact finder has found in a plaintiff's favor that the defendant engaged in the prohibited discrimination, punitive damages may be awarded within the limits of the statutory caps if the defendant has been shown to have acted with a state of mind that makes punitive damages appropriate, regardless whether the plaintiff also receives an award of compensatory or nominal damages.

*Id.* at 359.

Here, the ratio between the back pay damages, the sum of $125,000 and the punitive damages award of $195,000, is less than 2 to1, and is therefore reasonable. The standard for measuring excessiveness is whether the award "shocks the judicial existence" and constitutes a denial of justice, *Lee v. Edwards*, 101 F.3d 805 (2d Cir.1996); *Hughes v. Patrolmen's Benevolent Ass'n of New York Inc.*, 850 F.2d 876, 883 (2d Cir.1988). The Court finds that this punitive damage award does not shock this judicial conscience, nor does it constitute a denial of justice.

The third and final *BMW* phase of review of punitive damage excessiveness is "comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." As stated in *Iannone*, 941 F.Supp. at 414, "This analysis allows the Court to gear the punitive damage award to how seriously society as a whole regards the defendant's conduct." The statutory cap in Title VII punitive damages is the sum of $300,000, 42 U.S.C. § 1981 a(b)(3)(D). Under any standard, the Court finds that the award of $195,000 in this case is within the bounds capped by Title VII.

Accordingly, the defendant's motion for judgment as a matter of law dismissing the award of punitive damages in the sum of $195,000 and/or for remittitur, is denied.

### III. AS TO THE DEFENDANT'S RULE 59 MOTION FOR A NEW TRIAL

"A motion for a new trial ordinarily should not be granted unless the trial Court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Tesser v. Board of Education*, 370 F.3d 314, 320 (2d Cir.2004); *see also Armstrong v. Brookdale University Hospital*, 425 F.3d 126, 133 (2d Cir.2005). As an alternative to its request for judgment as a matter of law, or to vacate or reduce the punitive damages awarded to Cioffi, the defendant requests a new trial on the same three issues raised by its Rule 50(b) motion. These are (1) the record is devoid of any evidence that would support a finding that the plaintiff was constructively discharged; (2) the Court's failure to charge the *Kolstad* defense; and (3) the punitive damages award was excessive and should be vacated or subject to remittitur.

In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to Rule 59 may be granted by the District Court, even though there is evidence to support the jury's verdict, so long as the District Court determines that, in its independent judgment, "the jury has reached a seriously or erroneous result or (its) verdict is a miscarriage of justice". *Munafo v. Metropolitan Transportation Authority*, 381 F.3d 99, 105 (2d Cir.2004); *see also Nimely v. City of New York*, 414 F.3d at 392; *Manley v. Ambase Corp.*, 337 F.3d 237, 244–45 (2d Cir.2003). Also, the trial judge is free

to weigh the evidence herself and need not view it in the light most favorable to the winner. *Manley* 337 F.3d at 244–45. The District Court also has the discretion to "overturn verdicts for excessiveness and order a new trial without qualification or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d, 659 (1996) (citation omitted). However, as stated in *Bracey v. Board of Education of City of Bridgeport,* 368 F.3d 108, 113 (2d Cir.2004), "While it is clear that we have the power to review [for abuse of discretion] a trial judge's refusal to set aside a verdict for excessiveness ... the scope of our review is narrow."

The rule was clearly expressed in *DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998) as follows:

> The standards governing a district court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law. Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. *Song* at 1047. *A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is "egregious." Dunlap–McCuller* at 158. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility.

*See also Fugazy,* 983 F.2d at 363. (Emphasis supplied).

For the reasons stated above, the Court finds that the defendant has failed to show that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice as to any of the three grounds raised by the defendant. Contrary to its contentions on these three issues, for the reasons stated previously: (1) there was evidence adduced to support the jury finding of a constructive discharge;(2) as to punitive damages, the Court's failure to charge the *Kolstad* defense was waived by the defendant, and in any event, the evidence failed to support such a defense; and (3) the punitive damages award was not excessive.

Accordingly, the defendants Rule 59 motion for a new trial is denied in all respects.

## IV. *AS TO THE PLAINTIFF'S REQUEST FOR ATTORNEY FEES, COSTS AND PREJUDGMENT INTEREST*

The plaintiff's attorney, Raymond Nardo, Esq. requests the following relief: (1) "Prevailing Party" attorney fees in the sum of $85,356.80; and (2) Pre-judgment interest at the New York State rate of 9%, including pre-judgment interest on the punitive damages award. The "prevailing party" attorney fees sought by plaintiff's counsel include the following elements: (a) the fee of Raymond Nardo, Esq. at the hourly rate of $300.00 for 242.2 hours in the sum of $70,660.00; (b) the reduced fee of Raymond Nardo, Esq. for travel time at the hourly rate of $150.00 for 27 hours in the sum of $4,050.00; (c) Raymond Nardo's out-of-pocket costs and expenses in the amount of $5,972.85; (d) the fee of Raymond Nardo's associate, Jonathan Paul Fielding, Esq. at the hourly rate of $150.00 for 17.5 hours in the sum of $2625.00; and (e) Jonathan Fielding's expenses for mileage in the amount of $48.95.

In opposition, defendant's counsel submits that (1) Raymond Nardo's reasonable

rate should be $225.00 per hour; (2) plaintiff's counsel fees should be reduced by reason of the "unsuccessful claims"; (3) the 9.6 hours spent by plaintiff's counsel in anticipation of a motion for summary judgment by the defendant, which was never made, should be deducted; (4) any prejudgment interest must be calculated at the Federal rate; and (5) any pre-judgment interest should be limited to the back pay award and should not apply to the punitive damages award. The Court will consider all of the plaintiff's requests and the defendant's opposition.

## A. *As to the Costs and Expenses*

■ "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (quoting *United States Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir.1989)). In addition to mileage, the expenses that Raymond Nardo, Esq. seeks reimbursement for money that he paid for a filing fee, service costs, photocopying, the costs of depositions, and subpoena fees. These types of expenses are recoverable as part of a fee award, even if they are not generally taxable as costs. *See, e.g., Kuzma v. I.R.S.*, 821 F.2d 930, 933–34 (2d Cir.1987) ("Identifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under § 1988 and are often distinguished from non-recoverable routine office overhead, which must normally be absorbed within the attorney's hourly rate."); *Aston v. Secretary of Health and Human Servs.*, 808 F.2d 9, 12 (2d Cir.1986) (postage, photocopying, travel, and telephone costs reimbursable). Because these costs and expenses are recoverable, and the defendant does not object to this request, the plaintiff's counsel shall recover $6,021.80 for costs and out-of-pocket expenses.

## B. *As to the Hourly Rate*

■ Title VII provides in pertinent part: "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee … as part of the costs…." 42 U.S.C. § 2000e–5(k). In deciding whether to award attorney's fees, courts apply a two-step inquiry. *Pino v. Locascio*, 101 F.3d 235, 237 (2d Cir.1996) (citing *Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 571–72, 121 L.Ed.2d 494 (1992)). "First, the party must be a 'prevailing party' in order to recover. If she is, then the requested fee must also be reasonable." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The most important factor in determining the reasonableness of a fee is the degree of success obtained. *Farrar*, 506 U.S. at 114, 113 S.Ct. 566. Here, the plaintiff Rose Cioffi is a prevailing party who is entitled to attorney's fees because the jury rendered a verdict in her favor on the Federal and State retaliation claim and awarded her back pay and punitive damages.

As to the second step, courts use the "lodestar" method to determine the reasonableness of attorney's fees. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Under that method, a court makes an initial calculation of a lodestar amount by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763–764 (2d Cir.1998); *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir.1997). If the court finds that certain claimed hours are excessive, redundant, or otherwise unnecessary, it should exclude those hours from its lodestar calculation.

*Luciano*, 109 F.3d at 116. After the initial lodestar calculation is made, the court should then consider whether a downward adjustment is warranted by a factor as to the extent of success in the litigation. *Hensley*, 461 U.S. at 434 & n. 9, 103 S.Ct. 1933, 76 L.Ed.2d 40 (citation omitted).

■■■ Plaintiff's counsel submits that "considering the degree of success by a verdict of $320,000, counsel's background of 15 years experience concentrating and publishing in the field of Employment Law, and the competence and expertise of opposing counsel, a rate of $300 per hour is fair and reasonable for services rendered in the above matter" (Plf's Brief at 7 and 8).

Initially, the Court must comment on the level of legal services rendered by the attorneys on both sides of this case. The trial advocacy of Raymond Nardo, for the plaintiff and Joseph J. Ortego and James P. O'Brien, Jr. For the defendant, was outstanding. The trial attorneys were well-prepared, conscientious, diligent and, equally important, courteous and ethical in upholding the traditions of our profession. In addition, the post trial submissions were well written, relevant and helpful in all respects. These kinds of concise and focused writings have greatly assisted the Court in its determinations of these multiple motions.

Now, as to the proper reasonable hourly rate. Plaintiff's counsel affirms that he is a sole practitioner; that he has been practicing for more than 15 years; that most of his practice deals with employment law; that he has litigated in various courts and forums and completed three prior jury trials to conclusion in the Eastern District; and that he has published four articles in the field of employment discrimination.

■■■ The hourly rate used in the calculation must be the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience,

and reputation." *Luciano*, 109 F.3d at 116 (citing *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). In determining the lodestar calculation, the "community" to which the district court should look is the district in which the court sits. *Cruz v. Local Union Number 3 of the Int'l Bhd. Of Elec. Workers*, 34 F.3d 1148, 1159 (2d Cir. 1994).

In 1998, the Second Circuit held that rates of $200 for partners, $135 for associates, and $50 for paralegals were reasonable rates for legal services in the Eastern District. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir.1998); *see also Luciano*, 109 F.3d at 111–12 (collecting cases); *Association for Retarded Citizens v. Thorne*, 68 F.3d 547, 554 (2d Cir.1995); *Cruz*, 34 F.3d at 1160; *Irish v. City of New York*, No. 98 Civ. 713, 2004 WL 444544 (S.D.N.Y. Mar. 10, 2004) ($250 per hour). The Court will apply the rates prevailing in the Eastern District community for similar services by lawyers of reasonably comparable skill, experience, and reputation in making the initial lodestar calculation. *See Polk v. New York State Dep't of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983) ("normally a district court awarding attorney's fees under Section 1983, will consider the prevailing rates in the district in which the court sits").

Following the rule set forth in *Savino*, some Eastern District Courts have applied this standard. *See Fink v. City of New York*, 154 F.Supp.2d 403, 407 (E.D.N.Y. 2001) (partners $200.00 to $250.00 and associates $100.00 to $200.00); *Schwartz v. Chan*, 142 F.Supp.2d 325 (E.D.N.Y.2001) ($175.00 per hour for a sole practitioner); *Fernandez v. North Shore Orthopedic Surgery & Sports Medicine*, 2000 WL 130637, at *8 (E.D.N.Y.2000) ($225.00 per hour for partners and $100.00 per hour for associates); *Cush–Crawford v. Adchem Corp.*, 94

F.Supp.2d 294, 303 (E.D.N.Y.2000), aff'd, 271 F.3d 352 (2d Cir.2001) ($200.00 for partners and $135.00 for associates); *Greenidge v. Mundo Shipping Corp.,* 60 F.Supp.2d 10, 13 (E.D.N.Y.1999) ($225.00 per hour for a senior partner and $150.00 per hour for her associate).

The size of the firm representing a plaintiff seeking attorney's fees may also be considered a factor in determining a reasonable attorney's fee, primarily due to varying overhead costs. *See, e.g., Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1058–59 (2d Cir.1989) (noting that the size of an attorney's firm is relevant in determining the relevant community's "prevailing market rates" and that "smaller firms may be subject to their own prevailing market rate"); *Reiter v. Metropolitan Transp. Authority of New York,* No. 01 Civ. 2762, 2004 WL 2072369, at *7 (S.D.N.Y. Sept. 10, 2004). Recent cases in the Eastern District of New York have held that $175.00 to $200.00 per hour is an appropriate rate for a solo practitioner. *See, e.g., Louima v. City of New York,* No. 98 Civ. 5083 2004 WL 2359943, at *89 (E.D.N.Y. Oct. 5, 2004); *Schwartz v. Chan,* 142 F.Supp.2d 325, 332 (E.D.N.Y.2001) (citing *Savino v. Computer Credit, Inc.,* 164 F.3d at 87 (finding hourly rate of $175.00 reasonable)); *Walia v. Vivek Purmasir & Assocs., Inc.,* 160 F.Supp.2d 380, 382 (E.D.N.Y.2000) (finding hourly rate of $200.00 reasonable).

Accordingly, after considering all the factors in *Hensley,* the facts and circumstances of this case and experience of Raymond Nardo, the Court fixes his hourly rate of compensation at $250.00.

In addition, Nardo was assisted, in some aspects of this case, by Jonathan Paul Fielding, Esq., who was admitted to practice in New York in March 2005, and is now self-employed as a sole practitioner. He assisted Nardo in the research and preparation of proposed jury instructions; the post trial motion; and the charging conference and the brief in support of counsel fees and to amend the caption. The Court fixes his hourly rate of compensation at $150.00. However, his travel time, as well as that of Nardo, is to be reimbursed at one-half of the determined hourly rate. *See, e.g., McDonald v. Pension Plan of the NYSA–ILA Pension Trust Fund,* 450 F.3d 91, 98, 99 (2d Cir. 2006).

### C. *As to the Degree of Success*

When this trial commenced, the Court believed that plaintiff asserted only two separate causes of action under Federal and State Employment law; namely, sexual harassment-hostile work environment and retaliation. However, in arguments at the conclusion of the plaintiff's case, plaintiff's counsel also contended that he had made out a case of *quid pro quo* sexual harassment. The Court disagreed and granted the defendant's Rule 50(a) motion dismissing that cause of action. (Tr. at 1053–54).

In addition, the jury determined the Title VII sexual harassment-hostile work environment cause of action in favor of the defendant. In this regard, the jury decided that the plaintiff failed to prove that she was subjected to severe or pervasive unwelcome sexual harassment by her supervisor Kenneth Yarmosh. Also, the Court notes that in the plaintiff's successful Title VII retaliation cause of action, the jury declined to award any damages for emotional distress. As stated in *Hensley,* the Supreme Court stated that the "results obtained" factor is "particularly crucial where a plaintiff is deemed prevailing" when she did not succeed in all of her claims for relief. *Id.* at 430, 434, 440, 103 S.Ct. 1933.

With regard to the jury verdict in favor of the defendant in the sexual harass-

ment—hostile work environment cause of action, the Court finds that no reduction is required. In *Dominic v. Consolidated Edison Company of New York Inc.*, 822 F.2d 1249, 1259 (2d Cir.1987), the Second Circuit enunciated the doctrine of "substantial related and intertwined claims." In a similar situation in which the plaintiff did not prevail on her claim for discrimination but prevailed in the accompanying retaliation cause of action, the Court held:

> [T]he factual and legal theories underlying Dominic's age discrimination claim were inextricably intertwined with those underlying his retaliatory discharge claim. Consequently, a fully compensatory fee award was justified because Dominic recovered the same relief on the retaliation claim that he would have on his discrimination claim.

*Id.* at 1259, *see also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) "Where the district court determines that the successful and unsuccessful claims are 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories,' it is not an abuse of discretion for the court to award the entire fee."

In *Pinner v. Budget Mortgage Bankers, Ltd.*, 336 F.Supp.2d 217 (E.D.N.Y.2004), aff'd, 169 Fed.Appx. 599 (2006) a strikingly similar case, the jury returned a verdict in favor of the employer in the Title VII sexual harassment/hostile work environment cause of action but found in favor of the employee on the Title VII retaliation cause. The jury awarded no compensatory damages and $4,000 in punitive damages. In declining to reduce the attorney's fee, the Court cited the seminal *Hensley* case in which it was stated:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 434–37, 103 S.Ct. 1933, 76 L.Ed.2d 40.

In view of the interrelated claims involving the sexual harassment/retaliation cause of action, in *Pinner* the Court declined to reduce the fee on this issue.

> The Court finds that the withdrawn Title VII religious and gender discrimination claims were unrelated to the successful retaliation claim. However, the Court also finds that the failed sexual harassment-hostile work environment claim and the successful retaliation claim are related and inextricably linked. Therefore, the Court will make a reduction of five percent for the two withdrawn causes.

> In addition, the Court further finds that the Plaintiff's degree of success on the interrelated successful and unsuccessful claims, does not warrant a reduction on the fee award for those claims.

336 F.Supp.2d at 222.

The cases advanced by the defendant on this issue do not compel a reduction. In *Coffey v. Dobbs International Services Inc.*, 5 F.Supp.2d 79, 86 (N.D.N.Y.1998), rev'd on other grounds, 170 F.3d 323 (2d Cir.1999), the Court held that the harassment and retaliation claims were related, but it reduced the fee by 20 percent because the plaintiff was "unsuccessful as to every other claim, largely due to his failure to prove damages." In *Hine v. Mineta*, 253 F.Supp.2d 464, 467 (E.D.N.Y.2003), there was a "lack of success on two of the three causes of action" and the jury awarded no damages for emotional distress and

back pay. This Court reduced the attorney's fees by 60%. Also, in *Separ v. Nassau County Dept. of Social Services,* 327 F.Supp.2d 187, 192 (E.D.N.Y.2004), the "plaintiff originally pled several causes of action but failed to submit any material evidence in support . . . [and this] resulted in dismissal of those claims at the close of the plaintiff's case [and] . . . achieved only limited success," which required a 40% reduction.

 Here, in view of the *quid pro quo* claim dismissed at the end of the plaintiff's case and the failure to obtain any emotional distress damages, a reduction of 15 percent is appropriate.

## D. *As to the Alleged Unnecessary Hours*

Another important factor in the determination of a "reasonable" fee is the number of hours reasonably expended. In *Hensley* the Court stated that the district court should exclude from the fee calculation hours that were not "reasonably expended," as follows:

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). . . . *Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary,* just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 641 F.2d 880, 891 (1980).

461 U.S. at 434, 103 S.Ct. at 1937 (emphasis supplied).

 The defendant contends that plaintiff's counsel's request to be compensated for 9.6 hours, for time spent "in anticipation of a motion for summary judgment that defendant never made is patently unreasonable" (Dft. memo in opposition at 11). The defendant goes on to relate that it requested a pre-motion conference to discuss its contemplated motion for summary judgment. At the conference, the Court expressed doubt regarding the viability of this proposed motion and as a result, the defendant elected not to make the motion. However, plaintiff counsel asserts that he expended 9.6 hours preparing opposition to this motion that eventually was never made. As such, the defendant contends that these 9.6 hours should be deducted from the plaintiff's counsel's allowable hours.

However, defendant's counsel served the plaintiff with a voluminous Rule 56.1 Statement, with more than 173 paragraphs. Further, at the pre-motion conference, the defendant argued that this case should be disposed of by a motion for summary judgment. Also, in an expedited summary judgment schedule set by the Court, the plaintiff was only permitted 10 business days to respond to the defendant's motion. The Court finds that, by reason of the expedited motion schedule and the failure by the defendant's counsel to notify the plaintiff that it elected not to pursue the motion, the plaintiff was compelled to research and prepare its opposition in advance. The plaintiff's counsel will be compensated for the 9.6 hours spent in preparing to oppose the defendant's potential and requested motion for summary judgment.

## E. *Computation of the Attorney's Fee Awarded*

The Court now calculates the fee to be awarded to plaintiff's counsel.

| Fee of Raymond Nardo | |
|---|---|
| 242.2 hours @ $250 per hour = | $60,550.00 |
| 27 hours (travel) @ $125 per hour = | $ 3,375.00 |
| Fee of Jonathan Paul Fielding | |
| 14.5 hours @ $150 per hour = | $ 2,175.00 |
| 3 hours (travel) @ $75 per hour = | $ 225.00 |
| Gross Attorneys' Fee | $66,325.00 |
| Net After 15% Reduction | $56,376.25 |
| Plus Costs and Expenses | $ 6,021.80 |
| Total Net Attorneys' Fees, Costs and Expenses | $62,398.05 |

## F. As to the Rate of Pre-judgment Interest

 "Title VII authorizes a district court to grant pre-judgment interest on a back pay award." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993). Failure on the part of the district court to make such an award is generally considered by the Second Circuit to be an abuse of discretion. *Clarke v. Frank*, 960 F.2d 1146, 1153–52 (2d Cir. 1992). This award is intended to meaningfully make the plaintiff whole for the wrong she suffered. *See, e.g., Loeffler v. Frank*, 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988); *Sulkowska v. City of New York*, 170 F.Supp.2d 359, 370–71 (S.D.N.Y.2001). It is ordinarily an abuse of discretion not to include pre-judgment interest on a back pay award. *Sharkey v. Lasmo*, 214 F.3d 371, 375 (2d Cir.2000); *Gierlingér v. Gleason*, 160 F.3d 858, 873 (2d Cir.1998). The defendant acknowledges that pre-judgment interest typically is applied to a damages award representing compensation for lost wages. However, the defendant contends that there is no basis for plaintiff's contention that the interest percentage be set at the New York State rate of 9%. The Court agrees.

As previously stated by this Court and cited by both sides, in *Collins v. Suffolk County Police Dept.*, 349 F.Supp.2d 559, 565 (E.D.N.Y.2004) vacated on other grounds, 2005 U.S. Dist. LEXIS 130 (E.D.N.Y. Jan 7, 2005), the rule on pre-judgment interest in a Title VII discrimination case is as follows:

> Although the decision whether to award pre-judgment interest and the rate to be applied is left to the discretion of the district court, *see Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir.1998), "to the extent ... that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest." *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 375 (2d Cir.2000). *Further, in cases where the judgment is based on violations of both state and federal law, it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a). See, e.g., Greenway v. Buffalo Hilton Hotel*, 951 F.Supp. 1039, 1062–63 (W.D.N.Y.1997) (applying Section 1961(a) to interest on back pay award for violations under the Americans with Disabilities Act and the New York State Human Rights Law ("NYSHRL")); *McIntosh*, 873 F.Supp. at 883 (calculating pre-judgment interest for back pay award for unlawful retaliation under Title VII and NYSHRL in accordance with Section 1961(a)). Accordingly, the pre-judgment interest on the back pay award will be calculated at the current federal rate in accordance with 28 U.S.C. § 1961(a).

(Emphasis supplied).

Accordingly, the appropriate pre-judgment interest rate in this case involving a mixed federal and state judgment in which back pay is awarded is the federal rate set forth in 28 U.S.C. § 1961(a).

## G. As to Pre-judgment Interest on the Punitive Damages Award

 Unlike compensatory damages, punitive damages are not intended to compensate for her injuries or damages; they are designed to punish the defendant. *See State Farm Automobile Insur. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *Cush–Craw-*

*ford v. Adchem Corp.,* 271 F.3d 352, 359 (2d Cir.2001) (noting in Title VII case that "the objectives of punitive damages by definition differ from the objectives of compensatory damages"). Since punitive damages are not intended to provide full compensation to plaintiff, there is no basis for applying pre-judgment interest to the punitive damage award in this case. Accordingly, the plaintiff's request for pre-judgment interest on the punitive damage award is denied.

### V. *AS TO THE PLAINTIFF'S MOTION TO AMEND THE CAPTION TO ADD THE NEW YORK COMMUNITY BANCORP INC. AS A DEFENDANT*

 The plaintiff contends that the defendant was not named in its proper corporate capacity. She asserts that the actual corporate entity name on file with the New York State Division of Corporations is "New York Community Bancorp Inc.". Relying on Fed.R.Civ.P. 15(c)(3), the plaintiff asserts that she wishes to correct a mistake in the naming of the proper defendant. On the other hand, the defendant opposes this proposed amendment. It states the name "defendant, New York Community Bank" is a New York State chartered savings bank. Further, it contends that the plaintiff Rose Cioffi was employed by the New York Community Bank and there "has never been any suggestion that New York Community Bank is not the appropriate defendant or that it was not amenable to suit" (Dft's Memorandum of Law at 16). In addition, the defendant contends that New York Community Bancorp Inc. is a publicly traded Delaware corporation that owns the defendant New York Community Bank, and, that Rose Cioffi was never employed by that Delaware corporation.

The Court notes that the defendant New York Community Bank admitted in its answer that "the plaintiff was employed by the Bank." This is an employment discrimination case. The defendant New York Community Bank has always admitted that it—and no other named entity—was the plaintiff's employer. That being so, there is no need to add a corporation who did not employ the plaintiff.

Accordingly the plaintiff's motion to amend the caption to add "New York Community Bancorp, Inc.", is denied.

### VI. *CONCLUSIONS*

In sum, this Court makes the following determinations:

1) The defendant's Rule 50(a) and Rule 50(b) motions for judgment as a matter of law, are denied;

2) The defendant's motion for a new trial, pursuant to Rule 59, is denied;

3) The defendant's motion for a remittitur as to the award of punitive damages, is denied;

4) The plaintiff's counsel will recover out-of-pocket costs and expenses in the amount of $6,021.80;

5) Prevailing party attorney's fees are awarded to Raymond Nardo, Esq. at the reasonable hourly rate of $250 and to Jonathan Paul Fielding, Esq. at the reasonable hourly rate of $150;

6) Raymond Nardo, Esq. and Jonathan Paul Fielding, Esq., will be reimbursed for travel time at one-half of the above determined hourly rated;

7) Plaintiff's total counsel fees should be reduced by 15% by reason of the "unsuccessful claims";

8) The Court will include the 9.6 hours spent by plaintiff's counsel in anticipation of a motion by the defendant for summary judgment.

9) The total amount of counsel fees are:

| Raymond Nardo– | Fees | $54,336.25 |
| | Expenses | $ 5,972.85 |
| Jonathan Paul Fielding– | Fees | $ 2,040.00 |
| | Expenses | $ 48.95 |
| TOTAL NET FEES AND EXPENSES: | | $62,398.05 |

10) Pre-judgment interest on the back pay award is to be computed at the Federal rate;

11) There will be no pre-judgment interest on the punitive damage award;

12) The plaintiff's motion to amend the caption to add another named party defendant, is denied.

The Clerk is directed to enter judgment accordingly and is advised that this order closes the case.

**SO ORDERED.**